DELOURESE MAE SIGLER, appellee, v. LILBURN KENNETH SIGLER, appellant.

No. 52382.

(Reported in 150 N.W.2d 287)

MAY 2, 1967.

Life, Davis & Life, of Oskaloosa, for appellant.

Kenneth Richardson, of Ottumwa, for appellee.

BECKER, J.—This case comes before us on defendant-husband's appeal from judgment granting divorce, alimony and child support to plaintiff-wife on grounds of cruel and inhuman treatment. The parties were married July 26, 1949, and lived together until September 10, 1964. Two children were born of this marriage, RoseAnna and Kenneth, age 12 and 8 respectively at time of trial.

I. Before considering the evidence we will shortly review the ground rules for this de novo appeal as set forth in Beno v. Beno, 260 Iowa 442, 445, 446, 149 N.W.2d 778:

"A party seeking divorce on ground of cruel and inhuman treatment endangering life has the burden of proof.

"To entitle a party to a divorce under Code section 598.8(5), it is necessary two elements be proven, (1) inhuman treatment and (2) danger to life therefrom.

 "Life may be endangered by impairment of health.

"Danger to life is sufficient where the danger is reasonably apprehended.

"Proof of physical violence is not always necessary. Any mistreatment which deprives a spouse of needed rest, peace of mind, and affects the nervous system so that health is undermined, may endanger life as effectively as physical violence.

"A long-continued, regular and persistent course of faultfinding criticism and belittling, on the part of one spouse, may amount to cruel and inhuman treatment and where there is also a persuasive showing that such conduct has affected the health, physical or mental, and to some extent has thereby endangered the life of the spouse, a sufficient cause has been made to justify a divorce.

"To determine whether ground for divorce under the allegation of cruel and inhuman treatment exists, it is necessary to consider the entire record of the married life of the parties.

"Our review is de novo. We give considerable weight to the fact findings of the trial court but are not bound by them.

"Whether a course of conduct is such as will justify a decree of divorce on ground of cruel and inhuman treatment must be determined in each case upon its facts."

The factual situation in this case is not similar to that set out in Beno v. Beno, supra, but the rules are the same. We need not add additional citations here.

II. At the time of their marriage plaintiff was 16 years old. Defendant was 36. Defendant was reared on his father's farm and knew no occupation other than farm labor until about 1953 when he took his present job at the Ottumwa Country Club as maintenance man. Prior to the marriage defendant had served in the Armed Forces in World War II, had been severely wounded and has at all times since discharge been receiving a disability pension. Both hands have been permanently injured so that he is ineligible for work in the modern factories where he tried to get a job but he states that he is able to do a full day's work. The evidence is not in conflict that he is a good steady worker. Defense counsel also argues that his client suffered from severe nervousness due to his war experiences but we do not find this assertion to be justified by the record.

Defendant has been a saving and frugal man during his entire life. By 1949 when he married defendant had purchased

five acres of ground and a home near Kirksville for $2000 and had some cash saved. The record shows that during the 15 years of married life while defendant was making about $65 per week plus a pension which has risen from about $50 to $72 per month the savings continued at a very substantial rate. This was achieved under defendant's management despite the fact that the parties had to take care of themselves, and two small children. Plaintiff worked about the last three or four years before separation. Defendant's frugality, characterized by plaintiff and by the trial court as miserliness, had much to do with the marital discord.

There is less evidence of plaintiff's premarital background. She was a very young girl at the time of marriage. She had several brothers and sisters. How many is not shown. She complains that from about a year and a half after the marriage the union was an unhappy one.

III. In this case the evidence is in serious conflict. While little is to be gained by examining the facts in detail we must, in fairness to the parties, accomplish a sufficient résumé as to indicate the reasons for our decision. With this conflict in mind we first review the permissible findings if plaintiff's evidence is accepted.

Plaintiff and her witnesses, all related to her by blood or marriage, state that defendant was an extremely domineering husband; he constantly nagged, there was never enough done by plaintiff and what was done had to be done over, he constantly cursed plaintiff and called her foul names. Defendant is said to have laid the work out for plaintiff each day and insisted on it being done upon his return from work. He ran the household, bought the food and clothing but it was not enough for them, though he was saving substantial sums at the time.

Plaintiff insists that he nagged her while they were in bed to the point that she got up and slept on the floor in the dining room. She said this happened about a third of the time. She also stated that defendant struck her on two different occasions. Her former brother-in-law testified that when plaintiff was due to deliver her second child he was called to the Sigler home to take Mrs. Sigler to the hospital. She was having labor pains. De-

fendant is quoted as having refused to take his wife to the hospital saying that the baby was not his and he did not want to be bothered until after eight o'clock in the morning.

Other incidents were defendant's refusal to come and get his wife and children when they were visiting in Ottumwa, his refusal to allow her relatives to stay in the house over night even when it was raining so hard they could not leave (they slept in the car in front of the house), ordering all lights in the house turned off while his wife's relatives were visiting, and the like.

Despite the reluctance to have plaintiff's relatives stay over night or stay for meals, all witnesses for plaintiff agree that defendant's manner was very pleasant with them but very unpleasant and mean to his wife. Plaintiff left defendant once before but returned after a few days.

Plaintiff did say that she was allowed to write checks on the couple's joint account which had as much as $8000 in it. However, she insisted that she wrote checks only when defendant gave permission, or when it was absolutely necessary, not over $20; that he told her that it was his house, he bought it and paid for it, that she was his wife and he laid down the laws. She said she followed the law; if she did not it was too hard on the children. Toward the end of the marriage when plaintiff worked the money was used in part for herself but mostly for groceries and other household necessities. Plaintiff's entire position is possibly best summed up in the following statement: "As the effect of this nagging and berating I got to the point where I didn't care any more. I cried, I tried to find out what was wrong, why he would do it, why we had to live this way. Eventually I went to the doctor to get some nerve tablets, telling myself it would be better later, stick it out a while longer, so I did. It never seemed to help."

During her marriage she consulted Doctor Blome for a nervous condition that she attributes to defendant's actions. After leaving defendant she consulted Doctor Scott four or five times. It is a fair inference from the record that plaintiff's condition improved substantially after she separated from defendant.

Defendant vigorously denies practically all of plaintiff's case. One or two incidents referred to by plaintiff were acknowledged by defendant and explained from his viewpoint. However, all of plaintiff's corroborating testimony was castigated as lies by the witnesses, "they made it up before they got here." Defendant also had corroborating witnesses. They were neighbors and relatives. Their testimony fairly indicated that they had noticed no unusual nagging or wrongdoing by defendant. Their opportunities for observation were more limited than those of plaintiff's witnesses. Defendant's evidence strongly shows that defendant was in fact a hard worker, loved and showed concern for his children and was a good citizen as far as his neighbors were concerned. Insofar as groceries and food for the family were concerned, stress was laid on the presence of a large garden and a well stocked food cellar as a result of the parties' work raising food and preserving it.

We have given weight to the trial court's findings. We recognize that in resolving the conflicts present in the evidence much depends on the demeanor and credibility of the witness. But we have also examined all of the record evidence with care in order to arrive at our own judgment of the equities of this case. We conclude that plaintiff has carried her burden to show cruel and inhuman treatment such as to endanger her life. Extended discussions re the quantum of proof necessary for a divorce on such grounds under similar statements may be found in recent cases and need not be repeated here. Recent cases where divorces have been granted or upheld are: Beno v. Beno, supra; Burlingame v. Burlingame, 260 Iowa 18, 148 N.W.2d 493; Raushenberger v. Raushenberger, 258 Iowa 366, 138 N.W.2d 879; Hand v. Hand, 257 Iowa 643, 133 N.W.2d 63, and Arnold v. Arnold, 257 Iowa 429, 133 N.W.2d 53. Recent cases finding insufficient evidence are: Dvorak v. Dvorak, 260 Iowa 233, 149 N.W.2d 197; Elliott v. Elliott, 259 Iowa 1286, 147 N.W.2d 907; McMurray v. McMurray, 256 Iowa 97, 126 N.W.2d 336; Jewett v. Jewett, 252 Iowa 883, 109 N.W.2d 36; and Bowles v. Bowles, 248 Iowa 930, 81 N.W.2d 15.

IV. Defendant sought out plaintiff after she left him and tried to effect a reconciliation. Rev. Paul Beaver accompanied de-

fendant on at least two attempts at reconciliation. By this time plaintiff's attitude had apparently hardened and she refused to try again. These efforts, as well as defendant's acknowledged love and affection for his children, are to his credit.

Immediately upon leaving plaintiff went to Ottumwa which is near the marital home in Kirksville. About eight months later plaintiff went to reside in Illinois, some 300 miles from Kirksville. Defendant complains of denial of visitation rights both while plaintiff lived in Ottumwa and while she was in Illinois.

We note that the petition for divorce was filed September 12, 1964, just two days after plaintiff left the marital abode. Defendant's answer denying all material allegations was filed October 27, 1964. Neither party sought any ancillary relief or caused the matter to be heard until January 18, 1966, when the case was finally tried. During all of that 14 months the court had jurisdiction to adjudicate visitation rights pending appeal. No such adjudication was sought. Also during all of that period plaintiff might have sought temporary support but did not do so. Plaintiff accuses defendant of indifference to his children by failure to seek and get visitation rights. We do not think this a necessary conclusion. If defendant was seeking reconciliation he might well have been motivated by his desire to have his family return. In such event his failure to insist on seeing the children and his remaining away from them after complaints about his visiting them at school, might well have been commendable forbearance.

In any event the record is clear that defendant's love and affection for the children is genuine. The trial court has ordered that the parties arrive at an agreement as to rights of visitation. If this is not accomplished to the best interest of the children and reasonable satisfaction of the parties, the trial court will make provisions for visitation rights.

V. At the time of marriage defendant had his home and approximately $10,000 in personal property. At the time of separation the value of the home had increased to $3500, the parties had $17,800 in joint time certificates, $8761 in a checking account, $500 in U. S. Government bonds, a 1951 Chevrolet car, a cow and a calf, and the household furniture most of which

was fairly new. When she left plaintiff withdrew $6000 from the checking account.

After the separation plaintiff took training as a licensed practical nurse. She expected to graduate in the spring of 1966. She expected to be able to earn a starting salary of $350 per month at that time. She has spent most of the $6000 during the time she has been separated. While taking the practical nursing course she was paid $50 per week.

Defendant earns $65 per week about eight months a year. The other four months he received $35 unemployment compensation. He receives $72 per month government service pension and the interest from the certificates of deposit and bonds. He has purchased a new car since the separation.

The trial court awarded lump sum alimony to plaintiff in the sum of $6000 and offset that amount with the $6000 that she took when she left. The house and furniture were awarded to defendant, except the furniture actually purchased by plaintiff with her own funds. All property not specifically mentioned was awarded to defendant.

Plaintiff was given custody of the two children. Defendant was ordered to pay $50 per month per child until each reaches the age of 18 or becomes self-supporting. Further defendant was ordered to pay $1700 back child support from the time of separation to the time of the decree.

We hold that under all the facts the above provisions are equitable and the trial court's decree is approved. The back child support covered only the period of litigation. There was no need to and the court did not award back child support for a period prior to the commencement of the legal action for divorce. In seeking a solution that in the words of the statute "shall be right" this award is reasonable.

The court awarded plaintiff's attorney $100 fees to be paid by defendant. Neither party complains as to this allowance and it is therefore approved. Attorney fees for this appeal should also be and are allowed in favor of plaintiff's attorney and against defendant in the sum of $500 to be taxed as part of the costs, all of which are to be paid by defendant.—Affirmed.

All JUSTICES concur except THORNTON, J., not sitting.