**Donna LOVETT, Appellant,**

v.

**Gerald W. LOVETT, Appellee.**

**No. 52998.**

Supreme Court of Iowa.

Feb. 11, 1969.

Korf, Diehl, Clayton & Cleverley, Newton, for appellant.

Brierly, McCall & Girdner, Newton, for appellee.

MASON, Justice.

This is an appeal by the wife from decree denying her a divorce, alimony, custody and support of minor children, what she considered an equitable property settlement and holding she failed to establish condonation as affirmative defense to the husband's counterclaim for a divorce.

I. July 27, 1966, Donna Lovett filed petition for divorce against Gerald W. Lovett seeking custody and support of their children, alimony, property settlement and other relief alleging cruel and inhuman treatment such as to endanger her health and life. Defendant filed answer denying the basic allegations of the petition and a counterclaim asking divorce on the same ground and alleging affirmatively that plaintiff had absented herself from the home, neglected the children, was a bad influence upon them and unfit to have

their custody. He asked custody of the children and award of the property owned by the parties. Plaintiff filed answer to the counterclaim and alleged condonation as an affirmative defense thereto.

Following trial, defendant was granted a divorce, custody of their children subject to reasonable visitation rights to the mother, the equity in their Prairie City real property, the automobile, household goods and insurance policies as his exclusive property. Donna Lovett was awarded $5000 established as a lien on the Prairie City real estate until paid and $1250 toward her attorney fees to be taxed as part of the cost.

Plaintiff relies on three propositions for reversal: Error of the trial court in (1) denying her petition for divorce, (2) finding she had not established condonation on the part of defendant and (3) awarding custody of the minor children to defendant.

II. The parties were married in 1952. There were three children born to the marriage. At the time of trial Gary was 13, Linda 9 and Gregg 8. Plaintiff, 34, was a high school graduate. The husband, 43, also graduated from high school.

After graduating from high school and prior to her marriage plaintiff had been employed in Des Moines as a mail clerk, clerk typist, receptionist and secretary. After marriage she worked either full or part time until the oldest son was born in 1954, then part time at various jobs until 1965 when she obtained full time employment at Allied Construction Company in Des Moines where she worked until June 1966. After terminating this employment she devoted her time to housekeeping.

Defendant was drafted at the age of 18 after finishing high school, became a prisoner of war until 1945. Upon returning from overseas defendant began work with the Internal Revenue Service in January 1946 and at the time of trial had attained the grade of GS-9 earning an annual salary of $9000. His duties require him to travel outside the state on occasion.

During their marriage the parties built a modern, three-bedroom, one-level home with attached garage in Prairie City at a cost of $13,500 which was encumbered at the time of trial by a mortgage in the principal amount of $2700 with monthly payments of $88.88, taxes of approximately $200 a year and insurance premiums of approximately $60. The parties did much of the work themselves. In addition they had a line of furniture and a 1961 Oldsmobile.

■ Before considering plaintiff's evidence offered in support of her alleged ground for divorce we repeat some general rules of law set forth in Beno v. Beno, 260 Iowa 442, 149 N.W.2d 778, 780, which are well established and supported by authorities cited therein.

"A party seeking divorce on ground of cruel and inhuman treatment endangering life has the burden of proof.

"To entitle a party to a divorce under Code section 598.8(5), it is necessary two elements be proven, (1) inhuman treatment and (2) danger to life therefrom.

"Life may be endangered by impairment of health.

"Danger to life is sufficient where the danger is reasonably apprehended.

"Proof of physical violence is not always necessary. Any mistreatment which deprives a spouse of needed rest, peace of mind, and affects the nervous system so that health is undermined, may endanger life as effectively as physical violence.

"A long continued, regular and persistent course of faultfinding, criticism and belittling, on the part of one spouse, may amount to cruel and inhuman treatment and where there is also a persuasive showing that such conduct has affected the health, physical or mental, and to some extent has thereby endangered the life of a spouse, a sufficient cause has been made to justify a divorce.

"To determine whether ground for divorce under the allegation of cruel and inhuman treatment exists, it is necessary to consider the entire record of the married life of the parties.

"Our review is de novo. We give considerable weight to the fact findings of the trial court but are not bound by them.

"Whether a course of conduct is such as will justify a decree of divorce on ground of cruel and inhuman treatment must be determined in each case upon its facts."

These general statements are repeated with approval in Sigler v. Sigler, 260 Iowa 748, 150 N.W.2d 287, 288–289.

III. Although plaintiff does not contend there was physical violence, she maintains the facts show that throughout the marriage whenever defendant was displeased with her he gave her a silent treatment by refusing to talk to her, often for days at a time; that embarrassment she experienced through this treatment and other matters mentioned by her made her extremely nervous and caused loss of weight.

The husband had two life insurance policies issued by Bankers Life for $2000 each naming his mother as beneficiary and one Government policy of $10,000 in which plaintiff and the children were beneficiaries. Plaintiff was bothered by the fact the husband failed to change the beneficiary in the two Bankers Life policies as she suggested after the birth of each child.

Another of plaintiff's complaints stems from an occasion when her bowling team was to attend a tournament in Sioux City. The other members had planned to stay overnight but defendant insisted plaintiff return the same day. She returned about 2:00 the following morning. She asserts this embarrassed her as she felt like some little girl who couldn't do what other people could do.

She was further embarrassed when she had made arrangements two or three weeks in advance with three other couples to attend the movie "My Fair Lady" and it became necessary to cancel the engagement because of defendant's refusal to attend. Plaintiff had discussed the matter with defendant before contacting the other couples and when he didn't say much she assumed they were going. However, on the appointed evening defendant refused to go and plaintiff had to call the other people to cancel arrangements.

At the Allied Construction Company's Christmas party in 1965 plaintiff was again embarrassed. On the way to the party at the golf and country club plaintiff and defendant had stopped at a couple's home and had a few drinks. When they got to the party defendant stayed around the bar, drank too much, became intoxicated and sick. It was necessary for some friends to take him from the party and put him in his car. However, plaintiff continued at the party and had another drink.

Another source of complaint concerns defendant's silent treatment of plaintiff on occasions when they had arguments.

She asserts that often when they planned to go out with other folks, at the last minute defendant decided not to go, which embarrassed plaintiff. Normally defendant would not give her a reason why they did not go.

One silent spell ran for a period of one month. This followed their attendance at a New Year's Eve party in Colfax when defendant became disturbed at plaintiff's kissing some men who were not in their party. One incident when plaintiff danced around the floor with John Van Eckren during one long kiss seemed to be the main cause of defendant's displeasure. Plaintiff testified she had kissed other men besides Van Eckren and didn't notice whether defendant had kissed anyone or not.

In the late 1950's or early 1060's when the Colfax merchants were having a Queen of the Day contest, plaintiff was asked to be a contestant. Defendant was not impressed and suggested that if there

were 12 entries, plaintiff would finish No. 13. Plaintiff needed a dress to wear in the contest and her mother went with her to buy it. This upset defendant until he found out the mother had paid for the dress.

In July or August of 1964 plaintiff was invited to participate in the Monroe Old Settlers celebration. They were showing wedding dresses and needed someone to model a wedding dress of the era in which plaintiff and defendant were married. There were 20 or 25 girls participating in the wedding gown pageant. Defendant lacked enthusiam for this celebration and didn't take the children to see the program.

In September of 1965 plaintiff, defendant and the children were to have dinner at a Des Moines restaurant with another couple and their children. Plaintiff and defendant met outside the restaurant and when plaintiff asked defendant how he was, he made an obscene comment to her in the presence of their children. Plaintiff described defendant as having been drinking but not intoxicated. During the course of the dinner defendant engaged in an argument with the waitress about a drink, then with plaintiff. She contends he kept telling the children she liked big swimming pools and trips to California; that she had left them once and would leave them again. Plaintiff asserts the little girl began to cry but defendant kept up the conversation, making derogatory remarks to plaintiff throughout the evening in the presence of their children. This argument continued into the night after the parties arrived home. Plaintiff contends defendant called her a number of filthy names.

February 19, 1966, while attending a bridge party with about 12 people present, defendant announced he had gone without sex for eight months. This embarrassed plaintiff.

April 22, 1966, defendant had gone to a stag in Newton. The next evening plaintiff and defendant were discussing the incident with the McFaddens, their neighbors. When Mr. McFadden described the girls who did the strip tease plaintiff became quite inquisitive and asked him how much they took off. He answered, "Everything." Plaintiff said, "I don't know how anyone could do that in front of a whole room full of men." When asked, "Not even for $100 a shake?" plaintiff replied, "Not for $1000 a shake." Defendant said, "No, she would do it for nothing." Plaintiff says this embarrassed her.

On another occasion he threw his wedding ring at plaintiff and made a vulgar suggestion, stated he had never used it to get in and out of motels and hotels as she had and he had never run around with a bastard with syphilis. Another time he referred to her as a space woman in front of their children and gave the connotation.

The foregoing facts related by plaintiff on direct examination in greater detail appear to be those most strongly relied on in written argument to sustain her first proposition.

Many remarks allegedly made by defendant to plaintiff in their children's presence cannot be justified under normal conditions. Defendant denied having made some of the remarks in the children's presence and offered explanation as to circumstances leading to others.

Many remarks related by plaintiff were brought about by her conduct starting with her employment as a waitress in a Prairie City restaurant sometime in 1960 or 1961.

Before the third child was born plaintiff discussed with defendant the possibility of her working as a waitress in a Prairie City restaurant. Defendant testified she said, "These two little kids are driving me nuts; I've got to get out and meet people." She took the job working from 5:30 p. m. until about 9 p. m. for about a year.

One evening while at work plaintiff was seen by two witnesses talking to a truck driver from Oskaloosa. When the driver left the restaurant around 10 p. m. plaintiff left shortly thereafter. The witnesses followed her to a point where the truck was

parked, saw her get out of her car and into the truck cab, stay 10 to 15 minutes, get out of the cab and drive home.

In 1961 plaintiff started work as a salesgirl at Ardan's in Des Moines, stayed three to four years.

Sometime in early September of 1964 plaintiff was introduced in a Des Moines lounge to Milo Jones, who was married. September 25, 1964, while defendant was in Louisville in connection with his work and was due to arrive home later in the day plaintiff took the children to defendant's parents, their car to the airport and left with Jones for California. Plaintiff testified that before leaving for California she had sexual relations with Jones but couldn't recall where, how many times or how soon after their first meeting. Plaintiff was unable to recall how many times she had sexual relations with Jones during the two weeks they were gone but both going and coming they stayed in motels and lived as husband and wife. When she returned to Des Moines she stayed at a girl friend's apartment. During this period she spent one night with Mr. Jones at his home in Des Moines while his wife and children were gone.

About the end of October plaintiff discovered she needed medical attention, went to a Des Moines doctor and upon his recommendation, went to the Mayo Clinic at Rochester about November 15 where it was discovered she had cancer.

Although plaintiff had not attempted to see her children, call or write them after returning from California, she telephoned Jones from Rochester, advised him of the diagnosis. Plaintiff testified when Jones came to the Clinic she terminated the relationship which had existed between them, although Jones was in Rochester again after the operation. After returning with defendant to Prairie City December 1, 1964, plaintiff admitted talking to Jones probably 10 times, seeing him on the street and in a crowd in Des Moines, but denied he had ever been in her company since her return.

Plaintiff was contradicted by a defendant's witness who testified seeing plaintiff with a man in a Des Moines theater on a Sunday afternoon following Christmas of 1965 or New Years. After being introduced to Milo Jones at the court house during the trial this witness identified him as the man she had seen with plaintiff. Plaintiff failed to deny this incident on rebuttal. The credibility of the witness identifying plaintiff's companion as Milo Jones was for the trial court.

On one occasion after plaintiff's return from California but before her trip to Rochester she advised defendant that she was going to Albuquerque, New Mexico, with Milo Jones. Defendant testified, "She wanted to know if I would let the children come out during the summer vacation to the swimming pool. I told her no."

Plaintiff testified on direct examination that while in Rochester she and defendant had a discussion about her returning to Prairie City in which she stated she hated to go back to Prairie City because of embarrassment over her California trip and they discussed attempting to move. Sometime after plaintiff's return to Prairie City defendant's Des Moines office was moving to Kansas City and he had the opportunity for a transfer. He discussed the matter with his wife and asked her "what would be best and she really couldn't answer, and she didn't know what would be best. Under the circumstances, I thought it would be best to stay in Des Moines. At one time, she and I discussed whether she might leave again, and that if I went to Kansas City without anyone around that I knew problems might come up. She said she couldn't promise me she'd never leave." Except for looking at a house to rent in Des Moines they did nothing with respect to leaving Prairie City.

In January 1965 plaintiff began work as a receptionist for Allied Construction Company in Des Moines. Her immediate superior was John Hall. During the year and a half she was at Allied plaintiff frequently

discussed her marital problems with Hall. It was during this time defendant received many anonymous communications indicating there was misconduct between his wife and Hall. When defendant told his wife about the correspondence and cartoons and asked her to explain, she told him there was nothing to explain and accused him of having a jealous, filthy mind to even think she would do anything or question her about it. He had received similar answers when he attempted to visit with his wife about her coming home late while working at the Prairie City restaurant and as a secretary for legislators. January 14, 1966, plaintiff called Hall's home in the evening and asked that he meet her at a Des Moines lounge.

There were times plaintiff and Hall met at lounges, at the golf course, before work in the morning, for lunch and took business trips in and out of Des Moines. She described him as a sympathetic friend who has a romantic interest in her. Plaintiff denied the interest was mutual, although witnesses testified about her initiating contacts with Hall before going to work in the morning.

A defendant's witness testified to seeing Hall's car in the near vicinity of plaintiff's motel at Clear Lake during the summer of 1967 while plaintiff was there for an outing.

The deposition of Hall's wife taken by plaintiff was read in evidence by defendant. Mrs. Hall testified that at the 1965 Christmas party when defendant became intoxicated she found plaintiff and her husband outside in the entry way to the club. After Mrs. Hall had been harassed by telephone calls from Prairie City and reports and rumors of her husband being seen with plaintiff she gave him an ultimatum to either get plaintiff out of the office or leave their home. Two weeks later plaintiff left the company. It was after this she made a trip with Hall to Mason City to inspect the airport construction. She explained she "was interested in seeing the different buildings" and went to observe them herself.

Plaintiff admitted Hall had called at her home in Prairie City on two or three occasions late at night, but wasn't permitted in the house. This was after defendant had been removed from the Prairie City home by court order.

Sometime in the summer of 1967 plaintiff became involved with Larry Hall, no relation to John. The Jasper County deputy sheriff found plaintiff with Hall in the back seat of his car parked at an abandoned filling station near Colfax around 2 a. m. Plaintiff, Larry, Linda Jones and another man had been to a tavern in Newton. Plaintiff had left Gary sleeping at home with the telephone removed from the hook. Plaintiff had previously visited with Larry Hall in a Clear Lake cottage for approximately five hours. His wife was not with him.

IV. In Spofford v. Spofford, 18 Idaho 115, 108 P. 1054, 1056, a case factually similar, we find this apposite language:

"In the midst of this state of affairs, it is not to be wondered if the * * * [husband] should on some occasions so forget * * * [himself] as to administer a rebuke to * * * [his wife] and perhaps do and say some things which, standing alone, would appear cruel or wholly unjustifiable. It is true that such a course of procedure never improves the conditions; it rather tends to aggravate them. But that fact does not lessen the strain of human nature in the parties and their natural tendency to relieve their minds by words and acts. The party to the marital contract, who by * * * [her] acts and conduct thus invites a remonstrance, protest, or demonstration from the other party to the contract, must expect to exercise a degree of patience and forbearance which the law and good morals would not expect of * * [her] under more favorable circumstances." The same thought, identical in substance, is expressed in Knight v. Knight, 31 Iowa 451, 456.

By this we do not mean to say this defendant's conduct in the respects complained

of is commendable or that a spouse must forever endure it with patience.

When either party seeks a divorce from the other on the ground of cruelty which consists merely of profane and indecent language and conduct as distinguished from physical violence, the occasion for the words and conduct and the circumstances under which they were provoked must be taken into consideration and duly weighed before arriving at the conclusion that they constitute such cruelty as will justify a decree of divorce. Evans v. Evans, 82 Iowa 462, 464, 48 N.W. 809, 810, and citations; Salvatore v. Salvatore, 61 R.I. 109, 200 A. 438, 442.

Where both spouses have grounds for divorce, a divorce will not be granted to either. This is the doctrine of recrimination, Arnold v. Arnold, 257 Iowa 429, 433, 133 N.W.2d 53, 56, and citations and must be distinguished from cruelty which has been provoked. Cruelty which has been provoked does not give rise to a cause of action, but to show recrimination as a defense one must prove the existence of a cause of action for divorce. DeBurgh v. DeBurgh, 39 Cal.2d 858, 250 P.2d 598, 600, and citations; 24 Am.Jur.2d, Divorce and Separation, section 174. Provocation and recrimination, therefore, are not complementary, but mutually exclusive, defenses. 27A C.J.S. Divorce § 56(1); 1 Nelson, Divorce and Annulment, Second Ed., Section 6.15.

"The principle or doctrine of comparative rectitude is in the nature of an exception to the doctrine of recrimination and is applied in a few states, mainly by statute, where it appears the parties cannot live together and a divorce is best for their general welfare. We do not recognize this principle. * * * [Citing authorities]" Arnold v. Arnold, supra, 257 Iowa at 434, 133 N.W.2d at 56.

Provocation is a distinct defense.

Plaintiff's undignified and improper behavior with other men starting with the incident at the Prairie City restaurant could be found to have provoked much of defendant's conduct. Cruelty as a foundation for divorce must be unmerited and unprovoked. See 24 Am.Jur.2d, Divorce and Separation and 27A C.J.S. Divorce both supra. The trial court was correct in holding plaintiff had not sustained her burden of establishing by a preponderance of the evidence that defendant's treatment under the circumstances here was cruel and inhuman such as to endanger life.

V. The trial court noted in his findings of fact that plaintiff pleaded condonation, but during trial little emphasis was placed upon this point and concluded plaintiff had not established condonation on the part of defendant.

The burden of proof on a plea of condonation is upon the person asserting it. Leigh v. Leigh, 247 Iowa 358, 362, 73 N.W. 2d 727, 730; Nichols v. Nichols, 257 Iowa 458, 461, 133 N.W.2d 77, 79, and authorities cited in these opinions.

"Condonation, as the term is used in such matters, is the forgiveness of an antecedent matrimonial offense *on condition* that it shall not be repeated and that the offender shall thereafter treat the forgiving party with conjugal kindness. * * *" Fritz v. Fritz, 260 Iowa 409, 148 N.W.2d 392, 395.

Condonation is a conditional, rather than an absolute, remission of the offense, the implied condition being that the offense will not be repeated, Leigh v. Leigh, supra, and the offender will maintain good behavior as a spouse by refraining from acts and conduct in violation of his or her duties and obligations arising from the marital status. 24 Am.Jur.2d, Divorce and Separation, supra, section 203.

Plaintiff's plea of condonation is predicated upon the fact that she and defendant had sexual relations on three occasions between December 1, 1964, and July 27, 1966. Condonation requires an agreement to continue to live together as husband

and wife, followed by a carrying out of the agreement, expressed or implied, and a restoration of marital rights and privileges, including cohabitation. Massie v. Massie, 202 Iowa 1311, 1316–1317, 210 N.W. 431, 434, and citations.

 A restoration of the offending party to all marital rights is an essential element of condonation of cruelty. The conjugal rights of married persons include the enjoyment of association, sympathy, confidence, domestic happiness, the comforts of dwelling together in the same habitation, eating meals at the same table and profiting by the joint property rights as well as the intimacies of domestic relations. The marital rights to which the offender must be restored include more than sexual intercourse. See 24 Am.Jur.2d, Divorce and Separation, supra, section 211 and Annotation, 32 A.L.R.2d, p. 125, section 6, both citing Massie v. Massie, supra.

 Cohabitation is ordinarily merely evidence of condonation, giving rise to a strong inference, if not a presumption, of condonation but is not conclusive as a defense to cruelty. 27A C.J.S. Divorce supra, § 61; 1 Nelson, Divorce and Annulment, Second Ed., supra, section 1103.

 We agree with the trial court's holding that plaintiff failed to establish condonation on the part of defendant. Her second assigned proposition is without merit.

VI. Plaintiff's third proposition involves the custody of the minor children.

 In Utter v. Utter, Iowa, 155 N.W.2d 419, 421–422, we said:

"The best interest of the child is the first and governing consideration in determining who is entitled to custody of minor children of divorced parents, all other considerations such as parental rights and desires must yield readily to such determination and the court's decision must be based upon what will be most conducive to the general welfare of the children. Authorities need not be cited for this. Rule 344(f) (15), Rules of Civil Procedure.

"* * * * * *

"In all cases motherhood is a factor to be given weight in deciding questions of child custody and not every act of indiscretion or immorality should deprive a mother of the custody of her children because we recognize that a parent who has been guilty of some indiscretion or even immorality may reform and be capable of making a proper home for children. However, moral transgressions of the mother must be considered together with other relevant factors including the habits and propensities of the parties desiring custody of children in determining what is best for the child. Wendel v. Wendel, 252 Iowa 1122, 1125–1126, 109 N.W.2d 432, 434, and citations; Fritz v. Fritz, 260 Iowa 409, 148 N.W.2d 392, 397.'"

The court found that:

"The welfare of the children cries out for stability-ties to a home, school and church; the elimination of bickering and quarrels; the stopping of the destruction of their love and affection for both the mother and father; and team work in developing their lives along with a good education. At this stage of their lives and in light of their formative years, it seems self evident they should remain in Prairie City.

"Under the background of this case, there is little assurance plaintiff would remain in Prairie City for any lengthy period but is apt to move on at the very first opportunity. On the contrary, defendant is a life long resident of this community; has demonstrated his lack of desire to move away, and has continued on one job for more than 20 years—stability plus."

It is our responsibility to consider the case de novo. The evidence plaintiff left the children with grandparents the day she went to California with Jones, apparently without much concern about who cared for them in her absence; her complete failure to contact the children after her return to Des Moines until her discharge from the Mayo Clinic; and her inquiry of defendant

as to whether he would permit them to visit her in Albuquerque where she was planning to live with Jones, furnish strong indication she was "apt to move on at the very first opportunity."

In spite of defendant's protests plaintiff's insistence on working at the Prairie City restaurant and Ardan's so she might meet people and be away from the children who were driving her nuts and the fact she sought employment January 1965 after only one month's stay at home with the children served to convince us she was more concerned about being around people than looking after the welfare and best interests of these children.

Plaintiff's expressions of remorse and embarrassment over her trip to California appear rather insincere in view of her continued conduct after December 1, 1964, in associating with John and Larry Hall which admittedly took her away from the children on some occasions and caused her to leave their 13-year-old boy home alone at night with the telephone receiver removed from the hook.

Plaintiff's apparent efforts to mend her ways since commencement of the divorce action, while commendable, do not persuade us the best interests and welfare of these children would be attained by awarding their custody to plaintiff though we have considered every item of evidence which even tends to support her claim of custody whether specifically mentioned in this opinion or not.

On the other hand, defendant cared for the children in the evenings, helped them finish their meals, cleaned up after supper, bathed them, changed their diapers when they were small and got them ready for bed while plaintiff was working at the Prairie City restaurant.

When plaintiff was home defendant did as much, if not more, of this work than she. When they had to be fed at night, he took his turn on the middle-of-the-night feedings.

While plaintiff was working at Ardan's defendant took care of the children on Saturdays and Sundays, getting their meals and looking after their needs. He admitted plaintiff had been a good housekeeper and cook when she did cook.

Defendant testified that on more than one occasion before plaintiff left for California she made threats saying, "I am going to do away with myself, everyone would be better off." He recalled one such threat after she returned from her trip to California with Jones.

Plaintiff made no effort to contradict this testimony or that relating to defendant's care of the children.

Defendant told the court if he were awarded the children and the house he contemplated living in Prairie City with the children continuing their education in the same school and church they were then attending. During his work day he would hire a lady as he had done when plaintiff was gone. Although he had made no definite arrangements he was prepared to make them for the welfare of the children.

Defendant was described by his witnesses and at least five of plaintiff's witnesses, including her father, as "morally a good man", an exceptionally good father who loved his children, very industrious, extremely interested in his family and a person they had never heard a word against. Plaintiff's father felt defendant lacked a lot of drive and authority as far as discipline with the children was concerned. It is seldom, if ever, that we find all conditions in a divided home to be ideal where the welfare of children is concerned.

 Under the circumstances here the trial court did not err in awarding the children to defendant.

VII. Plaintiff's application for attorney fees for services rendered in this appeal with the resistance thereto were submitted with the appeal. Attached to the application is an itemized statement showing the dates and time involved for these services

with money advanced for transcript, printing record, briefs and arguments. Plaintiff's attorney had received an initial allowance of $200 and an additional amount of $1250 for services rendered in the trial.

Such an allowance was proper. Plaintiff required services of an attorney in defense of the husband's counterclaim for divorce on the ground of cruel and inhuman treatment. "* * * [T]he rule seems to be that it is immaterial whether the services of the wife's attorney are in defense of the husband's original action for divorce or a cross-petition by him asking such relief. In either event the husband may be held liable for services of an attorney in defense of the charge against her if the necessity therefor appears." Thorn v. Kelley, 257 Iowa 719, 722, 134 N.W.2d 545, 546.

Later in this opinion at 725 of 257 Iowa, 548 of 134 N.W.2d, we said Code section 598.14 "is broad enough to permit an award in favor of a spouse—usually the wife—against whom a divorce is decreed * * * but not where no divorce is decreed in favor of either spouse."

The question here is that of an additional allowance for services rendered plaintiff on appeal. In Arnold v. Arnold, 258 Iowa 850, 860, 140 N.W.2d 874, 880, we quote this with approval from Andreesen v. Andreesen, 252 Iowa 1152, 1160, 110 N.W.2d 275, 280:

"There is little doubt that in a proper case we may allow a wife attorney fees for services upon appeal from a divorce decree, especially where the husband appeals, even though she is not entirely successful in the ultimate decision. If this were not the rule the wife's rights might not be adequately protected."

In Erickson v. Erickson, 261 Iowa 264, 154 N.W.2d 106, 113, we held:

"Notwithstanding appellant does not obtain a reversal of the trial court's decree, we think an allowance of fees for her attorneys on this appeal, in addition to the * * *

[amount] previously allowed, is proper. This is implicit from our holding in Renze v. Renze, 247 Iowa 25, 31, 72 N.W.2d 490, 493. * * * [Citing further authorities]

"27A C.J.S. Divorce § 221 h, pp. 960–961, states: 'Usually, the right to counsel fees on appeal does not depend on the outcome of the appeal, so that the fact that the judgment or order from which the wife appeals is affirmed on appeal * * * does not preclude an allowance to the wife for counsel fees and expenses of suit in prosecuting * * * the appeal.'"

From the itemized statement attached to plaintiff's application, it is apparent counsel has spent a great deal of time preparing this appeal. Without in any way attempting to place a valuation on these services or what counsel should be paid, we simply determine what portion thereof should be paid by defendant. Plaintiff should be allowed an additional $1500 toward her attorney fees. Any amount due her attorneys above this additional allowance must be paid by plaintiff. Judgment shall be entered in the trial court for such additional amount.

Costs shall be taxed against plaintiff.

Except for the allowance herein made, the decree is affirmed. The matter is therefore

Affirmed and remanded.

All Justices concur except LeGRAND and LARSON, JJ., who dissent.

LeGRAND, Justice (dissenting).

I concur in the result reached by the majority but dissent from Division VII fixing attorney fees in the amount of $1500.

Under the circumstances here I find this allowance beyond defendant's reasonable ability to pay. I would reduce the amount to $500.

LARSON, J., joins in this dissent.