Leonard NELKEN, Appellee and Cross-Appellant,

v.

Lorene NELKEN, Appellant and Cross-Appellee.

No. 53730.

Supreme Court of Iowa.

April 7, 1970.

Rehearing Denied June 22, 1970.

Donald G. Senneff and Shaff & Farwell, Clinton, for appellant and cross-appellee.

Jeffrey B. Stoutner and Holleran, Holleran & Shaw, Clinton, for appellee and cross-appellant.

MASON, Justice.

This is a divorce action in which Leonard Nelken filed petition seeking divorce from Lorene Nelken, determination of property rights of the parties and custody of their minor children. His petition was based on the ground of cruel and inhuman treatment such as to endanger his life. Code section 598.8(5).

Defendant filed answer denying plaintiff's ground and later a counterclaim for separate maintenance, determination of property rights of the parties and custody of their minor children. Defendant's counterclaim was based on the same ground.

The court granted plaintiff a divorce and by implication dismissed defendant's counterclaim, awarded $12,500 to her as a property settlement, alimony of $400 per month continuing during her lifetime or until she remarries, custody of their son, Leonard Farley Nelken, with plaintiff being required to pay $125 per month toward the son's support until he becomes self-supporting or graduates from college, if he should seek higher education. Such support payments were to continue even though during the period of his college education the son married. However, child support payments were not to extend beyond the son's attaining the age of 25, unless his

education be interrupted by a period in the armed forces in which event the decree provided for modification.

In order to guarantee payments of alimony provided for defendant and assure payments of support for the son and his education for the estimated period that would be required, the court ordered plaintiff to keep in force two life insurance policies with a face value of $10,000 each, another one of $13,000 and a health and accident policy with regular death benefits of $5000 and maximum death benefits of $10,000 with loss payable to defendant for a period of ten years from date of the court's decree.

After awarding defendant a Buick, sufficient household goods to furnish a five-room apartment and $1378.95 toward her attorney fees, the court awarded the remaining property and custody of their other child, Andrea, to the husband.

Defendant appeals and plaintiff cross-appeals.

I. Defendant's assignment of propositions relied on for reversal may be summarized as challenging (1) sufficiency of the evidence to warrant granting plaintiff a divorce on the ground of cruel and inhuman treatment, (2) sufficiency of the corroboration of plaintiff's testimony, (3) the court's failure to apply the doctrine of recrimination, (4) the award of alimony, child support and property settlement as being inequitable, (5) denial of defendant's counterclaim for separate maintenance, (6) granting the divorce to plaintiff when he did not enter the court with "clean hands".

In his cross-appeal plaintiff attacks certain proceedings in the trial court, particularly the ex parte granting of a temporary injunction September 4, 1968, when plaintiff's petition had been filed September 3 and the court's refusal to grant his application to dissolve and vacate the injunction after a hearing held September 6.

■ II. Except when the petition for separate maintenance is based on a claim of desertion where a decree may be awarded prior to expiration of a two-year period required by statute for divorce on ground of desertion, usually a decree will not be granted to a wife unless the husband's conduct has been such as to justify a divorce. Brown v. Brown, 232 Iowa 1265, 1267–1268, 8 N.W.2d 414, 416; Peters v. Peters, 249 Iowa 110, 114–115, 86 N.W.2d 206, 209; and Jeffries v. Jeffries, 258 Iowa 623, 626, 138 N.W.2d 882, 884, and citations. Defendant alleged plaintiff's cruel and inhuman treatment of her warranted granting her separate maintenance.

The grounds alleged by the parties as a basis for relief sought are identical. In our de novo review we view the evidence of cruel and inhuman treatment in each case in the light of those well-established rules of law set forth in Beno v. Beno, 260 Iowa 442, 445, 149 N.W.2d 778, 780; Sigler v. Sigler, 260 Iowa 748, 749–750, 150 N.W.2d 287, 288–289; Lovett v. Lovett, Iowa, 164 N.W.2d 793, 796–797; and Lawler v. Lawler, Iowa, 175 N.W.2d 103, filed March 4, 1970, without repeating them.

III. Plaintiff and defendant were married December 8, 1951. Both had been previously married and divorced. Each had three children by his prior marriage. Neither custody nor support of those six children is involved in the present actions.

Plaintiff is a physician and had been practicing medicine for thirty years in the Clinton area at the time of the trial. Defendant, 47, is a housewife.

We will first consider plaintiff's evidence. It consists mainly of defendant's testimony when called as plaintiff's witness, his own, that of his daughter Andrea and Dolores Flynn, the doctor's receptionist.

Plaintiff's evidence was to the effect that during their marriage defendant had a long series of tantrums, screaming fits or manic episodes; there were hundreds of these episodes during which he had been kicked, clawed, punched, bitten, struck with a sugar bowl and a pocketbook, had an ashtray broken on his head, his shirt ripped

off, his glasses broken and his eye blackened. Most of these episodes continued through the night. He told of a stabbing incident with a turn signal lever from his automobile which he admitted was trivial, of being compelled to listen to these tirades.

He asserts most of the clawing and scratching was defendant's effort to prevent him from leaving the room; he had been followed from room to room, upstairs, downstairs, outside, around the house and into the car, not being permitted to escape this punishment. On occasion the children had been put into the car with suitcases and told they were leaving and never coming back. · There were approximately 180 tantrums during their marriage. In June of 1967 defendant called him into her room and stated she wanted a divorce, the house and $1000 a month. When he told her that was out of the question, he was hit on the back of the head with an ashtray. Labor Day 1968 he locked himself in the car when defendant was punching at him through the open window.

He said that as he gave her a pat "on her rear end" one night she called him a "son-of-a-bitch". She had attacked him personally, his family, religion and practice. He introduced slides of physical abuse by defendant. Defendant accused him of being a homosexual after an occurrence in Panama in 1965, of running around with several of his office employees and the girl who had helped them at the house a few years ago. Plaintiff claimed the episodes had a remarkable predilection for Sundays, holidays and vacations and that they have had this type of scene on vacations in at least five states and four countries.

Dolores Flynn stated that on occasion defendant talked to plaintiff in a loud voice over the telephone which could be heard in the hallways of the waiting room. She had observed the doctor when he had marks or contusions, scratches on his neck, a lump behind his ear and a black eye. She admitted she was not present and did not know who had inflicted the injuries.

Andrea testified she had seen her father with bruises, cuts, scratches and broken glasses. One time she felt a bump on the back of his head after an argument between her parents. She had heard arguments and quarrels but was unable to determine who had started them. She recalled an occasion when her mother and father were in the doctor's bedroom, of hearing her mother yell, going to the room and seeing her dad holding onto her mother. When she told her father to let her mother go, the mother took a swinging punch at him. Andrea described the arguments as sometimes frequent, lasting a day or two, sometimes a month or more apart. She had heard her mother following her father from room to room talking to him in a louder than normal voice but was not a witness to any of the physical violence claimed by her father.

She testified that her mother told her that if she appeared as a witness her mother would never see or speak to her again.

Defendant denied there had been a long series of tantrums, screaming fits or manic episodes or that the episodes went on all night. She testified there were only two occasions when she had inflicted physical damage on the doctor, denied she talked to him over the telephone in a loud voice or that she had accused him of being a homosexual. Her version of the specific instances relied on by plaintiff as acts of cruelty which he contended endangered his life was more precise as to the time of the occurrence of these events which the doctor had described in rather general terms without reference to dates.

Defendant testified she and the doctor had been having trouble since the first year of their marriage. Trial of this case commenced November 7, 1968. Neither she nor plaintiff appear to have omitted any of the arguments or quarrels that occurred during the 17-year interval.

Defendant described the Labor Day 1968 incident referred to by plaintiff as

stemming from her attempt to talk to her husband after dinner one evening about the state of their marriage. Plaintiff's daughter and her husband had visited the Nelkens the week before. While they were there defendant says her husband treated her fairly decently, but the minute they left he refused to speak to her, was cold and contemptuous toward her. When defendant asked if this was the manner in which their marriage was going to continue, defendant replied "yes" as far as he was concerned. When asked to discuss the matter sensibly, plaintiff went out of the house and sat in the car in the driveway. Defendant followed him, got into the car, put her head on his shoulder and said, "Honey, do you have any idea how lost and alone you make me feel?" He informed her he didn't give a "damn". Defendant returned to the house alone. Finally she decided to go see if he felt as miserable about the situation as she did. As defendant stood on the driver's side urging her husband to return to the house, his automobile started rolling forward. She warned him he was about to run over her foot. Plaintiff refused her request, kept going and did run over defendant's foot. The next day he filed petition for divorce.

In referring to the "ashtray" incident plaintiff described how in July 1967 after putting on her "sexiest nightie" she went into plaintiff's bedroom, sat on the edge of his bed and tried to pet him. He reacted by telling her to "go to hell". It was on this occasion she went to her room, smoked a cigarette and then returned to his room, complaining that his treatment was driving her out of her mind. She told him that she couldn't sleep; he told her to go take a whole handful of sleeping pills. When she inquired if he really wanted her to do that, he said, "Well, get the hell out of my room anyway", leaped out of bed at her. She threw the ashtray which hit the back of the bed, not plaintiff. He grabbed defendant, twisted her arm to the extent it was necessary for her to seek medical attention. This was the event described by Andrea.

Defendant's version of the facts giving rise to plaintiff's claim his wife accused him of being a homosexual occurred about four years before trial when the family was in Panama. Plaintiff had become acquainted with a young bachelor with whom he roomed for nearly two weeks while there rather than with his wife. The louvered doors and windows of their room were closed, the drapes drawn in a hot tropical climate. Defendant denied calling her husband a homosexual, but says she thought it very strange the two men shared a room for that length of time under those circumstances, particularly when defendant wanted to be alone with her husband.

Referring to the incident plaintiff accused her of hitting him with her pocketbook, defendant remembered the incident as occurring in August 1962. Her husband had been particularly abusive that night, had grabbed her by the arm, tore her blouse and dug his fingers into her arm. She admitted she swung the purse at him to get away, it hit him across the side of the face. This was the night she loaded the children into the car and went to the Davenport motel where they spent the night.

Defendant contends she never initiated the altercations between her husband and herself, was not the aggressor in attacking, but had become tired of being a punching bag and had purchased a book on self-defense.

Defendant admitted biting the doctor on the arm on an occasion when he was twisting her arm up behind her back and holding his other arm in front of her so she was unable to bend over to relieve the pressure. She said she "bit him, it was the only way I could keep him from pulling my arm right out of the socket".

Defendant contends the slides introduced in evidence by plaintiff reflected an incident growing out of an argument in June 1960.

In support of the ground alleged in her counterclaim defendant told of an incident ten years before when her husband placed her in a shower while fully dressed, alternately turning on hot and cold water, holding her face directly under the shower head so she couldn't breathe.

There was an incident eight or nine years before trial when her husband struck her with his doubled-up fist, blackened her eye, split her lip and then gave her a hypodermic injection that made her so ill she spent the night on her knees beside the toilet vomiting.

Defendant took a picture of a black eye plaintiff had given her about five years before trial. She couldn't remember what brought on the argument.

There was another occasion four or five years before trial when plaintiff slapped defendant. Mrs. Nelken testified there were countless acts of physical cruelty inflicted upon her during their marriage.

In the ten months preceding trial plaintiff had taken 56 days of vacation, including a trip to Panama in January and St. Louis in March without his wife or children. In July plaintiff took his wife and son to Panama, disappeared from them and they had to come back from the vacation by themselves. Defendant says plaintiff had disappeared routinely Thursdays, Saturdays, Sundays and many evenings without advising her where he was.

Defendant contended her husband was having an affair with a Mrs. Richard Rohr. In July 1968 defendant received a telephone call telling her if she wanted "to see where her husband goes to make out with his girlfriend follow them north out of town someday". Defendant drove to the cemetery at Eagle Point Park, saw her husband and Mrs. Rohr sitting in plaintiff's car. She had followed them out of Lyons. She had seen her husband in Mrs. Rohr's company on other occasions— one noon walking arm in arm, another time defendant and the boy saw plaintiff with Mrs. Rohr.

In March while the doctor was a patient in one of the hospitals following a hernia operation defendant went to the hospital one evening as she had been taking him his meals. She recalled the occasion as being next to the last day the doctor was in the hospital. When defendant entered the room Mrs. Rohr was kneeling beside his bed giving him a bath. The doctor was unclothed. Mrs. Rohr was not working for the hospital or the doctor at the time.

The son Leonard testified that when the family was in Panama about three years before the divorce, he saw his father with an Elizabeth Hans. "He seemed to be talking a little more than I would consider normal to her and I thought he hung around her more than he did with my mother."

It is to be noted plaintiff did not attempt to deny his association with women other than his wife.

 Conduct of one spouse toward another of the opposite sex, even without adultery, may amount to such inhuman treatment as to afford ground for divorce. Rasmussen v. Rasmussen, 252 Iowa 414, 420, 107 N.W.2d 114, 117–118; Arnold v. Arnold, 257 Iowa 429, 435, 133 N.W.2d 53, 57; and Daugherty v. Daugherty, 260 Iowa 878, 881, 151 N.W.2d 569, 571.

She asserted her husband had made numerous statements he knew methods of doing away with her which would leave no trace. Defendant believed her husband was referring to insulin shock.

Defendant had a nervous breakdown in October 1967 and was still under the care of a psychiatrist at time of trial. She said she was concerned for her personal safety, particularly since she had found out her husband was running around with other women and was terrified to have him living in the same house for fear he might kill her.

This excerpt from her testimony emphasizes best her complete despair caused by her husband's treatment:

"All sentiment and feeling I had toward the doctor has been destroyed and is long gone. There would be no reason that this marriage could continue. I could not go back; I went back a year ago. * * *. I want nothing more to do with the doctor in the way of having him living in the home with me or attempting to go on. I do not want ever to live in the same house with the man again; I don't think I would be safe."

We are convinced plaintiff's open association with women other than his wife, a fact undenied in the record, constitutes cruel and inhuman treatment of defendant. This plus his continuous and deliberate neglect of his wife's desire for his companionship could not help but impair her health. She had testified that "during the past year the doctor and I have not lived together as husband and wife. We have been under the same roof. He has refused to have any part of me. * * * I thought * * * when I dropped the divorce suit we were going to make a try at making something of this marraige, but I did all the attempting to make something of it, and he was utterly contemptuous; he refused to speak to me after he came in the house; he refused to go any place with me * * *". This is not denied or explained by plaintiff.

■ As previously stated, our review is de novo. We are not bound by the trial court's findings and it is our responsibility to review the credible evidence and determine for ourselves whether it was of the necessary weight and sufficiency to grant relief.

■ We have done this in reaching our conclusion that the evidence warrants granting defendant a decree of separate maintenance on the ground plaintiff's treatment of his wife was of such cruel and inhuman nature as to endanger her life.

■ Defendant by the case presented, by her pleadings and her evidence, asks only for separate maintenance; the court cannot force upon her a divorce against her will. Such action by the court would be contrary to public policy. Although she would be entitled to a divorce, should she ask it, she has the legal right to maintain the marital status until she asks dissolution. Davis v. Davis, 209 Iowa 1186, 1189, 229 N.W. 855, 857.

■ We disagree with plaintiff's contention defendant's conduct constituted cruel and inhuman treatment justifying granting him a divorce. Cruelty as a foundation for divorce must be uninvited and unprovoked. Lovett v. Lovett, Iowa, 164 N.W.2d 793, 800–801.

The doctor's behavior in Panama in associating with Elizabeth Hans, his companionship with "Jungle Jim" under the circumstances described, his behavior toward his family in disappearing and sending his wife and son home without apparent concern whether they had sufficient financial means to make the trip, while the doctor remained for an additional week, as well as his behavior with Mrs. Rohr in public and in the privacy of his hospital room, if believed, could be found to have provoked much of defendant's conduct of which plaintiff now complains.

Such provocation is to be distinguished from recrimination. See Lovett v. Lovett, supra.

■ Much of plaintiff's evidence as to the screaming tirades and physical abuse is either denied or explained to some extent by defendant and is uncorroborated. The fact Mrs. Nelken raised her voice when she lost her temper does not impress us as conduct calculated to endanger the doctor's life.

■ The trial court erred in granting plaintiff a divorce and in denying defendant's separate maintenance under the circumstances before the court.

In arriving at this determination we are aware of the legislative change made in our divorce law to become effective July 1, 1970. However, this case calls for a determination of relief to be granted parties under the law as enunciated in our decisions construing Code section 598.8(5), not what relief might be possible under a given factual situation after July 1970.

IV. On remand the trial court in setting aside the divorce decree and granting defendant separate maintenance as directed here shall fix plaintiff's obligation to pay toward the support of their son Leonard in the same amount it provided in the divorce decree with the same provision for guaranteeing payment of these amounts for the estimated period required. It is our understanding from the record that Leonard prefers to live with his mother while Andrea prefers to live with her father.

V. The separate maintenance decree shall also award defendant the items of personal property set off to her in the divorce decree. Such an award, although perhaps in the nature of a division of property, is desirable under the circumstances, otherwise a cash outlay would be required of plaintiff to purchase necessary furnishings for an apartment for defendant and the son.

VI. The question of the amount to be allowed defendant for her separate maintenance and support is difficult. The parties own a residence originally costing $47,000. It seems agreed that with improvements it has a present value of $51,400 less a mortgage of $18,385.11 encumbering the premises. It is without dispute plaintiff's assets consisted of three Investors Diversified Services certificates in the amounts of $5,103.95, $15,435.22 and one held jointly for $8,681.47; cash surrender value of insurance policies of $5,720; cash of $650.83 in travelers checks; accounts receivable from his practice of $20,331; $10,390.29 in various checking accounts; and Nissen Corporation stock $495.

Deducting the mortgage from the value of the house total assets were $99,822.65.

Tax returns reveal plaintiff had a total income of $30,335.23 in 1965; $32,620.61 in 1966; and $34,903.31 in 1967.

Plaintiff had had a month and one-half of shorthand and typing when she was 18, later worked as a switchboard operator at the newspaper after she finished high school. Before her first marriage defendant worked at Iowa State College as a sales clerk in the poultry division earning about $70 per month, during that marriage she had worked part time selling shoes earning about $5 per week. She had also worked as a clerk briefly and for about two weeks as a secretary at the hospital. In about 1965 she had done survey work earning about $150 for the project. She does not feel that she is capable of being employed at the present time. She does have an interest in her father's estate which, for inheritance tax purposes, had a net value of $101,937.66. However, this included jointly-owned property of $6,599.35.

Under her father's will the entire estate is held for her mother's benefit for the rest of her mother's life, with the trustee having power to invade the principal for her mother's benefit. A trustee's financial statement showed that if her mother were to die October 22, 1968, (the date defendant answered interrogatories propounded) defendant would have an interest of approximately $32,000 in the trust. The mother has the power of appointment over a part of the trust.

Defendant's only income is $15 a month from a $1,179.91 obligation of her former husband.

Plaintiff estimated her expenses would require payments of $1,000 per month including $250 per month for rent or house payments. She asked an additional $150 for each child. Certain items, with the possible exception of the amount allocated for church support, appear at first glance to be rather high, but the trial court had

noted the family enjoyed a high standard of living.

The foregoing reveals to a degree the doctor's ability to pay and defendant's needs. In Cooper v. Cooper, 259 Iowa 277, 282, 144 N.W.2d 146, 149; Gerk v. Gerk, Iowa, 158 N.W.2d 656, 663; and Schantz v. Schantz, Iowa, 163 N.W.2d 398, 405–406, we specified various matters entitled to consideration in arriving at an equitable determination of rights and obligations of the parties to a divorce action. They are relevant in some respects in a separate maintenance action.

In light of the guidelines set forth in these decisions we award defendant $625 per month for her separate maintenance in addition to the $125 per month awarded for Leonard's support in Division IV, supra.

The trial court in its decree of separate maintenance shall provide the same provisions for assuring payments of this award as it did in the divorce decree and in addition shall provide that such payments of separate maintenance and child support shall constitute a lien against plaintiff's interest in the Hillcrest residence and in the event of plaintiff's failure to pay said amounts when due, execution shall issue thereon from time to time upon the application and affidavit of defendant, or that of her attorneys, as to the amount of unpaid installments due.

VII. In her counterclaim defendant sought a lump-sum allowance of $40,000 to enable her to purchase a replacement home. However, as noted in estimating her expenses at trial, she included $250 for rent or house payments. Although defendant asserts the trial court erred in failing to grant defendant separate maintenance and made an inequitable division of the parties' property in the divorce action, she does not contend in this court she be allowed a lump-sum award in the event we grant separate maintenance.

In any event, "the general rule is that maintenance should be provided by periodical payments rather than by a gross sum. 42 C.J.S. Husband and Wife § 623, pp. 251, 252; 27 Am.Jur., Husband and Wife, 23, 24, section 415. We have ourselves said in Avery v. Avery, 236 Iowa 9, 14, 17 N.W.2d 820, 823:

' "In the absence of very special circumstances, we do not think such an award [a gross sum] should be made in a separate-maintenance suit. The considerations which support a lump-sum award or division of property in a divorce action that terminate property rights are not present in separate-maintenance suits where property rights are retained." '

'But we did permit an award in gross to stand in the Avery case, and it is said that settlements in these cases in lump sums are sometimes approved in exceptional circumstances "or when consented to." 42 C.J.S. Husband and Wife § 623, page 252, supra." Schultz v. Brewer, 245 Iowa 240, 247, 61 N.W.2d 446, 450–451.

Here we have neither a stipulation of the parties consenting to a lump-sum award nor the exceptional circumstances referred to in Avery v. Avery, supra.

Therefore, the trial court in entering a decree granting defendant separate maintenance shall not make any lump-sum allowance. Of course, defendant retains her interest in the Hillcrest residence whether it be as joint owner, co-owner or one entitled to the distributive share provided by statute. The record does not indicate how title to the homestead is held.

VIII. The trial court made a temporary allowance of $300 to defendant for attorney fees, a further allowance of $1378.95 for services rendered in trial. These allowances appear equitable. The separate maintenance decree shall provide judgment for such amounts.

IX. Defendant's application for allowance of transcript and printing costs, attorney fees for services rendered on appeal was ordered submitted with the appeal.

 The costs of securing a transcript, printing expenses and costs incurred in the appeal paid by the defendant as shown by the itemized statement attached to defendant's application total $623.62. December 30, 1968, this court ordered plaintiff to pay $300 to defray these costs. Judgment shall be entered against plaintiff in the trial court for the balance of $323.62.

Defendant's motion for allowance of attorney fees sets forth an itemized statement of time spent by defendant's attorney in rendering services on appeal, computed on a unit basis suggested by the Bar Economics Committee. The method employed has been helpful to the court in determining the merits of the application. Plaintiff resists the application as excessive and unreasonable.

 Undoubtedly, defendant's counsel has spent a great deal of time preparing this appeal. Without in any way attempting to place a valuation on this service or what counsel should be paid, we simply determine what portion thereof should be paid by plaintiff. Lovett v. Lovett, supra, Iowa, 164 N.W.2d at 804. Defendant should be allowed an additional $2500 toward her attorney fees. Any amount due her attorney for services on this appeal above this additional allowance must be paid by her. Judgment shall be entered in the trial court for such additional amount. See Lawler v. Lawler, supra.

X. Defendant in an affidavit seeking relief in this court after perfection of appeal stated that she had moved out of the Hillcrest residence. This, coupled with the facts that her estimate of expenses in being maintained separately included a specific item for rent, compels the conclusion she is in effect asking that plaintiff be required to maintain her and their son in a substitute home comparable to that to which they had become accustomed and has at least impliedly consented to plaintiff's occupancy of the Hillcrest homestead. The award made for her in Division VI, supra, is based on this inference from the record.

XI. We have considered matters urged by plaintiff in his cross-appeal and find them to be without merit.

The cause is reversed and remanded with instructions to the trial court to enter a decree consistent with this opinion.

Reversed and remanded.

MOORE, C. J., and STUART, RAWLINGS and REES, JJ., concur.

LARSON, BECKER and LeGRAND, JJ., dissent.

UHLENHOPP, J., takes no part.