LUCINDA TREMBLAY *vs.* LEO TREMBLAY.

DECEMBER 22, 1937.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J.    This is a petition for divorce from bed and board and is based upon three alleged grounds, gross misbehavior, neglect to provide and extreme cruelty.    In the superior court, the respondent filed a motion in the nature of a cross petition for an absolute divorce from the petitioner. After hearing, the trial justice denied the respondent's motion and granted the petition on the single ground of extreme cruelty.    The case is before us solely on the respondent's exception to the granting of the petition on this ground.

It appears in evidence that the parties were married June 29, 1925, and kept house together until 1930, when they separated for about three weeks.    Upon reconciliation they went to live, as boarders, in the home of the respondent's parents, until they separated again in August 1936. Between 1930 and 1936 both parties worked in the same mill, the respondent continuously earning $32 weekly, and the petitioner earning $14 weekly when working at full time, and $7

to $8 when working on piecework. Two children were born of their marriage, one of whom died in infancy. The other, Frances, is now ten years of age. The respondent paid $15 per week to his parents for the board and lodging of himself, the petitioner, and their child. The petitioner paid out of her own earnings, without any substantial assistance from respondent, all the other bills for clothing, medical and surgical attention for both herself and child, and for school fees and equipment for the child.

In September 1935, the petitioner answered a telephone for the respondent, which turned out to be a call from one of his alleged "girl friends." When the respondent appeared later, his mother informed him that his "girl" had telephoned and the petitioner informed him that the girl was told that he was married. The petitioner's testimony further shows that the respondent was plainly upset and "got sore" and told the petitioner, "I am going to show you to mind your own business," whereupon he "slapped me again" and said: "If you are not satisfied, you know what you can do. Get to hell out." According to the petitioner, he also caught her arm and threatened to throw her downstairs, but was stopped by the intervention of his mother. The respondent denied any such slapping, threat or attempt to throw her down the stairs.

The petitioner did not then leave the respondent, and matters continued until August 7, 1936. Meanwhile, according to the petitioner, the respondent continued to go out almost nightly, to entertain and associate with other girls, to take trips to New York and Washington without notifying her of his intention to go or telling her where he had been. The respondent also received correspondence, following some of these trips, from one or more of his alleged "girl friends." He did not take his wife to Canada after 1935, as was his annual custom, nor did he at any time take his wife and child out in his automobile or to places of recrea-

tion. The petitioner at first used to remonstrate with him about his conduct and associates but, because this led usually to scenes, she gave it up to keep peace in the family.

On Friday, August 7, 1936, the respondent, although having his own pay, asked the petitioner to contribute two or three dollars toward the $15 to be paid for their board. He promised to repay it to her, but the petitioner, apparently unwilling to approve his conduct and spending on others, refused to make such contribution. This refusal led to some unpleasant words and to a violent physical attack upon her by the respondent. The respondent denied that he then and there assaulted the petitioner, as she claimed, but testified that he merely held her arms to prevent her threatened attack upon him. His version of this incident is not corroborated.

At any event, there is evidence to show that respondent became "sore" and exhibited a violent temper; that he beat and slapped his wife on the face, neck and back, and otherwise caused bruises to show on her arms; that the intervention of his mother, who testified that he was "mad" and that she was afraid he would get "more mad and hit her", prevented further physical injury. The petitioner testified that, following this assault, she went, accompanied by the respondent's mother, to the police station to complain against the respondent and on her return was ordered out of the house by the respondent's father.

Following this assault, the petitioner was able to go to church as usual, and to work for a while, the latter being then reduced to two or three days a week. However, she claims that her health became impaired by the respondent's conduct and attacks, that she gradually grew more nervous and unable to sleep nights, or to eat, and that she finally suffered a nervous breakdown, requiring her to stop all work. It is not denied that she was unable to work and did not work for about six weeks prior to the hearing, and that her work

in the mill was available to her if she had been able physically to perform it.

Her physical injuries from the assault, the impairment of her health, and her later inability to work were corroborated by the testimony of her sister, with whom the petitioner went to live, and to some extent by her brother. There was also evidence that the respondent had attempted, on more than one occasion, to induce the petitioner to sign the necessary papers in order to obtain an absolute divorce; and that, on her failure to so agree on one occasion, he grabbed their minor daughter and carried her bodily away from her mother to his car and drove away.

The trial justice found that there was not sufficient evidence to support the petitioner on the ground of gross misbehavior or neglect to provide. However, he expressed the opinion that he was satisfied that there was sufficient evidence of extreme cruelty to support her petition on that ground. He therefore denied the respondent's cross petition, and granted the petition on the ground of extreme cruelty. He also awarded the custody of the minor child to the petitioner, together with allowances in the sum of $8 per week for the support of the petitioner and the child. No serious contest is made over the custody of the child or the allowances.

The respondent contends that the evidence discloses a mere isolated act of the respondent's slapping the petitioner with an open hand, without intention to injure and without any real injury to her or her health. He argues that such evidence is insufficient to support the decision on the ground of extreme cruelty within the meaning thereof, and relies on the cases of *Corcoran* v. *Corcoran*, 50 R. I. 434; *Ricard* v. *Ricard*, 52 R. I. 288; *McKeon* v. *McKeon*, 54 R. I. 163.

If this were all the evidence showed, the contention of counsel for the respondent would have persuasive force. But an examination of the transcript of evidence fairly estab-

lishes that there was something more than a mere isolated "family fuss," as urged by the respondent and his counsel. There was evidence of at least two incidents within a year of the filing of the petition, where the petitioner was subjected to assault by the respondent, resulting in bodily injury which, in the latter instance, left marks that were observed by other witnesses. On these occasions the respondent was not acting casually or accidentally without intention to harm according to the testimony, but showed distinct evidence of a violent temper and an intent to injure the petitioner. Moreover, these incidents were accompanied by threats to do further and greater injury to the petitioner, which apparently were prevented by the intervention of the respondent's mother.

When the respondent's acts and remarks during the "last fuss," as he termed it, became so violent as to cause his own mother to intervene to stop him, and to ask if he "was crazy" or "was going crazy", and to faint as the result of the respondent's conduct toward the petitioner, it cannot fairly be said to be a mere casual "family fuss" or an isolated instance of casual and harmless slapping. The fact that the respondent's mother thereupon accompanied the petitioner to the police station to register a complaint against the respondent, if indeed she did not actually join in the complaint, furnishes further reason to support the above contention.

There is also evidence tending to show that the respondent pursued a persistent course of questionable conduct, connected with certain acts of physical violence and cruelty, causing an impairment of the petitioner's health. That there was such connection seems clear, because every reference by the petitioner to the respondent's habits and conduct, particularly as to other women, always made the respondent "sore", and provoked, directly or indirectly, the scenes wherein he assaulted and injured the petitioner.

In none of the cases above cited and relied on by the respondent, was there evidence of any actual striking of the

petitioner by the respondent, and an examination of them discloses other material differences in their facts which distinguish them from the instant case.

What constitutes extreme cruelty as a ground for divorce is not ordinarily the subject of precise definition. Each case must be determined upon its peculiar facts and the proof of the resulting effect of the alleged acts of cruelty upon the health of the petitioner. See *Bastien* v. *Bastien,* 57 R. I. 176; *Grant* v. *Grant,* 44 R. I. 169; *Borda* v. *Borda,* 44 R. I. 337; *McKeon* v. *McKeon, supra.*

So far as the issues of fact turned on the credibility of the witnesses, the trial justice saw and heard them as they testified. Undoubtedly the weight to be given to the respondent's testimony was greatly weakened, in the estimate of the trial justice, by his evident disregard for his oath in one particular instance of importance, and by some unconvincing reasons in his other testimony on a phase of the case which is not before us.

We have repeatedly held that the findings of the trial justice upon conflicting evidence should not be reversed unless the respondent sustains before us the burden of showing that such findings are clearly wrong and that the decision fails to do justice between the parties. *Reilly* v. *Reilly,* 57 R. I. 432; *Warren* v. *Warren,* 33 R. I. 71.

From a careful examination of the transcript, we cannot say that the respondent has sustained that burden, and there appears to be sufficient evidence to support the decision.

The respondent's exception, therefore, is overruled, and the case is remitted to the superior court for further proceedings.

*Adonat J. Demers,* for petitioner.
*Ambrose Kennedy, James T. Greene,* for respondent.