CARMELLA SALVATORE *vs.* LOUIS J. SALVATORE.

JUNE 23, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This is a divorce proceeding, which is before us on a bill of exceptions by the petitioner, the only exception being to the decision of the trial justice of the superior court granting the respondent's motion in the nature of a cross-petition for a divorce on the ground of extreme cruelty.

The wife's petition was for a divorce from bed, board and future cohabitation on the grounds of extreme cruelty and gross misbehavior and wickedness repugnant to and in violation of the marriage covenant. At the end of her testimony and that of her two witnesses in support of her petition, the trial justice denied the petition on the ground that the evidence showed that "she was guilty of extreme cruelty toward her husband; capricious, unreasonable, unworthy of a husband"; and that "she made life unbearable for her husband through her many caprices." To this decision she took an exception which has not been pressed.

The trial justice then stated that he required no further proof of extreme cruelty on the cross-petition, but would require evidence of good conduct on the part of the respondent. The testimony of the respondent himself was then introduced. At its end, in reply to questions by the justice, the respondent's attorney stated that he had four other witnesses, who would testify to the general conduct of the respondent as a husband, to the condition of the home and to the way in which he always supported his wife and the way in which she had treated him. The justice then stated that he had heard enough testimony, and neither party offered any more.

There is really very little dispute as to the facts. The parties were married on November 24, 1932, and separated three times, viz., in April 1936, on May 30, 1936, and in January 1937. The petitioner used the word "hell" at times and even told her husband to go there, though she knew that he objected to her using the word and even slapped her for it. The real trouble began apparently when she found two ticket stubs from a Boston theatre in his pocket, as she was putting away his clothes the next morning after he had returned home late from a day spent in that city. She accused him of taking some girl to the theatre there and would not be satisfied with his explanation that he had gone to the theatre with some men, after attending a convention in Boston. This led to a quarrel between them and she afterwards at times showed a good deal of jealousy, which led to quarrels.

She also complained of his coming home quite late at times, and on these occasions she showed annoyance and jealousy; and quarrels resulted. He complained also that she "nagged" him a great deal and in that way often interfered greatly with his sleep. The most serious action by her that appears in the testimony is that one night she told him falsely that she had swallowed iodine in order to commit suicide, and in that way she kept him awake and in distress

all night, in the course of which he tried to get a physician and finally, at about half-past four o'clock in the morning, took her to a hospital.

After he had separated from her the last time she incurred two bills of $29.75 and $97.45 for clothing and took them to him to be paid. He testified that fully six times in their married life she had tried to kick him, pull his eyes out, pull his collar open or pull his hair; and that he had to push her away. But he did not testify that she ever hurt him.

Besides these special things, about all that he complained of was constant "nagging" and abusive language and accusations of unfaithfulness to her. She even followed him with a car late in the evening and saw him take into his automobile a young woman and go on a long drive with her. He admitted that he did this, but testified that this was only an accommodation to the young woman, who was, he said, only an acquaintance and customer of his, and that nothing improper occurred. Other witnesses testified to seeing him on several occasions, driving or riding with a young woman. But as to these occasions also he denied that anything improper occurred.

He did testify, however, that he became so annoyed by his wife's jealous accusations that he told her that he had a "lot of girls"; that he had "one in East Providence, one up on Elmwood avenue" and one in Pawtucket; and that he said this "to keep her quiet". He testified also that one night, knowing that he was being followed and watched, he deliberately "picked up" a young woman and drove along with her, so that his wife would know about it "and maybe that would fix her".

As to the effect of her conduct upon his health, all the testimony was his own. When his attorney said to him: "As a result of all this treatment that your wife administered to you, I will ask you whether or not you actually lost any weight", he answered: "I did", and when asked how many pounds, he answered: "12 to 15 pounds". He later

testified that after their final separation he used to go to see her every Sunday to take her the $5, which he was paying her for her support, and she used to ask him to come back to live with her; but that he had lost weight and was sick with severe nervous indigestion; that when he went one Sunday, she would be all right and on the next she would be so quarrelsome for an hour or two that he would go out sicker than when he went in. He testified that therefore he gave up all thought of going back to live with her; that she had "made a wreck" of him and that he was still a wreck.

In his discussion of the evidence, the trial justice showed that he did not fully believe the testimony of the respondent as to his relations with the young women with whom he had been driving; and that he believed that there was something more than platonic friendship involved. Still he found "that there was no gross misbehavior on the respondent's part which would deny him a right to a decision on his cross-petition." The trial justice made no finding or any comment whatever as to any effect of the petitioner's conduct upon the respondent's health.

In the absence of physical injury due to something in the nature of violence it is only in a very unusual case that a divorce is granted on the ground of extreme cruelty. In *Grant* v. *Grant*, 44 R. I. 169, 116 A. 481, a decision on this ground in favor of a petitioning wife was made in the superior court and sustained in this court, without proof of any violence on the part of the husband. But, as this court said, at page 172 (482): "He wilfully and designedly pursued a course of conduct, both in public and private, which was calculated to and actually did distress and humiliate his wife, not once but repeatedly.", and it was found that "the inevitable result of the continuance of such conduct on the part of respondent would be injurious to the health of his wife."

In *Borda* v. *Borda*, 44 R. I. 337, 117 A. 362, a divorce was granted on that ground to the respondent wife, where no

physical violence was shown. But there was convincing evidence of "a course of conduct on the petitioner's part, wilfully and maliciously persisted in, which naturally resulted in causing in the respondent a wretchedness of mind affecting her health and making it impossible for her to longer endure conjugal relations with the petitioner." The court added, at page 341 (364): "This deliberately cruel conduct of the petitioner undoubtedly affected the already impaired health of the respondent, as she claims that it did, and as her physician testified would be its natural result."

In *McKeon* v. *McKeon*, 54 R. I. 163, 170 A. 922, a decision granting a divorce to a wife on the ground of extreme cruelty was reversed by this court, which said: "There is no evidence of physical violence or threats of the same. The evidence relied upon in support of the charge of extreme cruelty does not prove a course of conduct deliberately intended to humiliate the petitioner and destroy her peace of mind."

In *Bastien* v. *Bastien*, 57 R. I. 176, 189 A. 37, a decision in the superior court in favor of a husband on his cross-petition, based on alleged extreme cruelty practiced upon him by his wife, was reversed by this court, which, at page 178 (38), said: "The decisions of this court are clear on this point, that physical acts of cruelty are not of themselves indispensable to support a charge of extreme cruelty under the statute but their absence must be supplied by evidence of a deliberate course of conduct cruelly calculated to cause and which did in fact cause an impairment of health of the injured party." See also *Tremblay* v. *Tremblay*, 59 R. I. 401, 195 A. 596, where a divorce from bed and board and future cohabitation was granted to a wife on this ground and sustained by this court.

In our opinion, where there is no evidence of injurious physical violence, the requirements of such cruelty as defined in the cases above cited, with resulting clear damage to health, must be at least as strongly insisted upon when

the ground of extreme cruelty is relied on by the husband against his wife as when it is relied on by the wife against her husband. In the instant case there was no such strong and convincing evidence of a deliberate course of cruel conduct by the wife, intended to destroy the peace of mind of the husband, as there was on the part of the husband toward his wife in the *Grant* and *Borda* cases, *supra*. Nor was the alleged conduct such that the *inevitable* result of the continuance of such conduct would be injurious to the health of the respondent.

There was no corroboration of the testimony of the respondent as to the effect of the wife's conduct on his health, and his testimony on that subject was not very satisfactory. The trial justice did not mention that subject at all; and in discussing the testimony of the respondent as to the latter's conduct with other women, he expressed considerable doubt of the respondent's veracity. Moreover, a few months before he left the petitioner the last time, the respondent, instead of patiently trying to allay her suspicions of his fidelity to her and to quiet her jealousy, had only made the situation worse by acting and speaking in the ways which we have above stated.

In 1 Bishop on Marriage, Divorce and Separation, § 1647, the author says that a wife "cannot ordinarily complain with effect if herself materially in fault." Just a few words further on, he says: "Or if she has fallen into any impropriety, though not criminal, and her husband's jealousy is excited, she should use every reasonable effort to soothe his excitement and remove its cause. And if, though she is wholly blameless, her husband suspects her of adultery and accuses her of it, she should not by her conduct increase his suspicions, but strive to allay them." In volume 2, § 442, the author, in discussing cruelty says that "a defending husband may show such ill conduct or other provocation from the wife as, under the circumstances of the particular case,

renders ill conduct of his, otherwise adequate for a divorce, inadequate."

The case of *Spofford* v. *Spofford,* 18 Idaho 115, 108 P. 1054, bears a striking resemblance to the instant case. The opinion begins thus: "This action was instituted by the husband against the wife, praying for a decree of divorce on the grounds of cruel and inhuman treatment. The plaintiff alleged that the defendant for a couple of years pursued a course of abuse, nagging and hectoring the plaintiff, until she drove him to the verge of nervous prostration, and impaired his health both physically and mentally." After stating the facts shown by the evidence, the court, at page 119, continues: "The result of the wife's jealousy of the attentions her husband paid to these several women was many protestations, lectures, and, as the husband testifies, hostile demonstrations on the part of the wife, often extending far into the night and disturbing his rest and peace of mind and breaking down his health. This, he says, became so bad and trying he could no longer endure it, and he accordingly left his wife and declined to live with her any longer."

The next paragraph is as follows: "Under the circumstances of this case, the acts proven against the respondent cannot be held to constitute extreme cruelty within the meaning of the statute. (Sec. 2649, Rev. Codes.) By this we do not mean to say that respondent's conduct in this regard is commendable or that a man must forever endure it with patience. The appellant, however, has not been free from blame and censure. He has pursued a course of conduct toward other women which was calculated to arouse suspicions on the part of the wife and to kindle the fires of jealousy. It is fair to say that the record entirely fails to show that appellant has been criminally intimate with any of these women; it rather inclines us to the belief that he has not, but he has been indiscreet and unwise in his conduct, and he certainly owed it to his wife as well as to himself to 'avoid the appearance of evil'. It is fully as essential

to domestic happiness and tranquility that the parties to the marriage contract so conduct themselves that each may be above suspicion from the other as it is to in fact be innocent of the suspicioned act."

The court held that on account of the provocative and inconsiderate, though not in itself wrongful, conduct of the husband, he was not entitled to a divorce. In denying a petition for a reargument, the court used this language, at page 123: "When, however, either party seeks a divorce from the other on the grounds of cruelty which consists merely in words and conduct as distinguished from physical violence, the occasion for the words and conduct and the circumstances under which they were provoked must be taken into consideration and duly weighed before arriving at the conclusion that they constitute such cruelty as will justify a decree of divorce."

In our judgment the same reasoning should be applied in the instant case and the same result reached. Taking into consideration the conduct of both parties, as shown by the evidence, we are clearly convinced that neither was entitled to a divorce from the other and that the trial justice was clearly wrong in his decision granting the respondent's cross-petition.

The petitioner's exception is sustained. The respondent may appear before this court, if he shall see fit, on July 5, 1938, and show cause, if any he has, why the case should not be remitted to the superior court with direction to dismiss his motion in the nature of a cross-petition.

*Rosenfeld & Murphy, John G. Murphy,* for petitioner.
*Edward H. Ziegler,* for respondent.