Russell W. CONKLING, Appellant,

v.

Martha Lou CONKLING, Appellee.

No. 54380.

Supreme Court of Iowa.

April 9, 1971.

Rehearing Denied June 17, 1971.

William R. Crary, Cedar Rapids, and E. Eugene Davis and Glenn L. Smith, Des Moines, for appellant.

David M. Elderkin, Cedar Rapids, for appellee.

UHLENHOPP, Justice.

In this appeal we pass upon the provisions of a decree relating to divorce, custody, and support in a contested divorce suit.

Plaintiff Russell W. Conkling, age 49, grew up in Des Moines, received degrees from The University of Iowa in liberal arts and medicine, served a residency in general surgery, earned a certificate as a Diplomate of the American Board of Surgery, and practiced surgery in . Newton and Cedar Rapids, Iowa.

Defendant Martha Lou Conkling, 45, spent her childhood in Cedar Rapids, took part in social affairs there, attended The University of Iowa where she met plaintiff, and married plaintiff on March 23, 1946.

Three sons were born to the parties, William in 1947, James in 1954, and Jeffrey in 1958.

The marriage was beset with problems from the start. Plaintiff is a dedicated and well-qualified surgeon. At the time the parties married, plaintiff was serving his internship, and they lived in an apartment in Detroit, Michigan. Plaintiff was thereafter in the United States Army for two years, working in the orthopedic surgical service at various army hospitals.

Plaintiff was required to spend nearly all of his waking hours at work. He had little time and energy available for defendant.

About Christmas time in 1948, defendant told plaintiff she did not want to live that way and desired a divorce. She took their son, William, and returned to her parents in Cedar Rapids. . Plaintiff was upset, returned to Iowa, and unsuccessfully attempted reconciliation. Defendant's father firmly but kindly told plaintiff that defendant wanted a divorce. Eventually plaintiff commenced a divorce suit, defendant counterclaimed for divorce, plaintiff did not contest, and defendant was awarded a divorce in June of 1949.

Following the divorce, plaintiff lived in Des Moines with his parents. He obtained a surgical residency in Des Moines, which he completed in three years. During that period he visited his son William in Cedar Rapids as he could, and saw defendant.

Then plaintiff worked as a surgeon for a year and a half in Iowa City and completed the requirements to be certified by the American Board of Surgery. While in Iowa City he saw defendant more frequently, and this led to their remarriage on May 29, 1953.

They next moved to Newton, Iowa, where James was born in 1954. Plaintiff worked hard to establish a practice there. He spent long hours and most of his energy toward that end, and the old problems between him and defendant returned—insufficient time together and attention to her.

In 1958 the third son, Jeffrey, was born. That year the parties built a nice home. Although plaintiff's work consumed most of his time, he did take the family on vacations occasionally. Nonetheless, the marriage was deteriorating, but plaintiff appears to have been so engrossed in his practice as not to appreciate what was happening.

The deeper trouble started becoming manifest about 1960. Defendant became

more and more unhappy with plaintiff. She would leave social functions or refuse to attend in the first place. She frequently refused to take meals with the family and went to her room by herself. She became embittered.

During the next several years, defendant's conduct with respect to her spouse was of a nature we strongly disapprove. We have carefully examined the evidence and have concluded not to set forth the details. The facts would be of enlightenment to no one. We will therefore merely say that the evidence clearly shows defendant was guilty of cruel and inhuman treatment endangering plaintiff's health and life, and that plaintiff has established the allegations of his petition in that respect.

In the early 1960's, defendant developed a lump over one eye, which turned out to be low-grade cancer. In 1963 and 1964, she underwent surgery and plastic surgery. A good result was achieved. The entire experience was hard on defendant emotionally, however, and this did not help the marriage.

In June of 1964, plaintiff joined a surgical partnership in Cedar Rapids, and left the family temporarily in Newton so that William could complete high school there and the home could be sold. Plaintiff commuted home weekends when not on call.

On February 18, 1965, at Newton, defendant filed a divorce suit against plaintiff. Plaintiff still felt every effort should be made to hold the family together, and in May of that year the parties reconciled. In September of 1965, defendant and the boys moved to Cedar Rapids where the family lived in a rented home. On July 9, 1966, defendant dismissed the Newton divorce suit.

On October 25, 1966, defendant filed another divorce suit against plaintiff, this time in Linn County, and had plaintiff enjoined during the pendency of the suit from entering the home. Taking the boys, defendant moved to a Cedar Rapids house which was being purchased by her mother. The lease expired on the house the parties had been renting, and plaintiff took an apartment. He visited the boys and had them with him as his time permitted. The family situation remained in this posture for about a year.

By agreement, the pending divorce suit in Linn County was set for trial for November 6, 1967. On November 2, 1967, Mrs. Conkling's counsel in that suit learned of pressing matters elsewhere preventing his preparation for the divorce trial and sought a continuance. Opposing counsel would not consent, and the court refused to grant delay. Thereupon Mrs. Conkling's counsel dismissed the suit under protest.

Dr. Conkling thought another reconciliation might be effected, but his hope was short-lived for Mrs. Conkling soon told him she would commence another suit.

On Sunday, November 19, 1967, plaintiff and the boys were together at plaintiff's apartment. About 8:00 p. m. plaintiff was preparing to return the boys to defendant's home when a message was received that defendant was in the emergency ward of a local hospital. Plaintiff immediately went there. Defendant had been in a serious automobile accident. She had sustained very severe facial lacerations, a broken jaw, and injured teeth. She had been taken to the Cedar Rapids hospital.

From that hospital defendant was taken to Iowa City by ambulance, with plaintiff following in his car. In Iowa City she underwent lengthy surgery. Recovering, she left the hospital December 9th. Following that she had substantial dental work done, costing $1,359. While defendant was in the hospital, plaintiff lived in defendant's home and took care of the boys. Without defendant's permission, plaintiff had his apartment telephone line bridged with the line to defendant's home so that he could receive his calls. However, after defendant left the hospital and plaintiff returned to his apartment, plaintiff did not have the bridge removed. He could thus overhear

and record her messages, and did so on occasion. These messages and recordings were not introduced on trial, perhaps because the bridge was effected without defendant's consent and no audible tone was employed to indicate recording.

The accident did not change matters as far as the possibility of reconciliation was concerned. Plaintiff concluded that the marriage was in fact at an end, and on April 29, 1968, after defendant was up and around, he filed the instant divorce suit against defendant. Defendant counterclaimed for a divorce.

Trial of the present action commenced April 1, 1969. On trial, defendant as a witness refused to answer certain questions on the ground her answers might incriminate her or hold her up to public ignominy. After trial, the court awarded plaintiff a divorce, granted defendant custody of the two minor sons, and ordered plaintiff to pay alimony and child support. (The son William is of age, and plaintiff is educating him at The University of Iowa.)

Both parties appeal. The appeals involve the three basic issues in cases of this kind: (1) Should a divorce be granted and to whom? (2) Who should have custody of the minor children? (3) What should be done about the financial aspects and costs? The parties urge a number of legal problems, which we will consider as far as necessary in the disposition of these three basic issues.

I. *Divorce.* Defendant opens her argument thus: "It is obvious from reading the trial judge's opinion that he felt this marriage should be dissolved and we thoroughly and completely agree." The reference is apparently to this observation by the trial court: "It is evident to this Court that this marriage has gone beyond any hope of reconciliation and cannot be preserved and that it would be for the best interests of all persons concerned that it be dissolved." We think the trial court's observation is a wise one.

The case was tried under the former fault theory of divorce and must be so decided by us. 63 G.A. Second Session ch. 1266, § 34. The fault theory presupposes that one marriage partner is blameless and the other one is guilty. Such a situation seldom exists, of course, for husbands and wives being mortal, ordinarily some responsibility for discord rests on the shoulders of each of them. Ordinarily too neither spouse is all bad—as will be seen here in connection with the remarkable children this couple has reared.

Applying the fault theory here as we must, however, we agree with the trial court that plaintiff should have a divorce. True, plaintiff was too wrapped up in his occupation. Surgery is evidently an absorbing profession and this particular surgeon was certainly involved in it. Defendant was a woman who especially needed attention, and almost from the start the life of a physician's wife was not for her. Unhappiness and inharmony resulted. Had matters gone no further, we might be inclined to say that cruel and inhuman treatment was not established as was held in McMurray v. McMurray, 256 Iowa 97, 126 N.W.2d 336.

■ But matters went considerably further. We believe, as the trial court did, that defendant was guilty of serious misconduct, and, as we have stated, that plaintiff has established his grounds for divorce. The trial court rightly decreed plaintiff a divorce.

II. *Custody.* Notwithstanding defendant's misconduct and all of the trouble that existed in this home, these two people produced three fine sons. Both spouses influenced the sons, so both spouses must have some good traits, at least, as regards the children.

The evidence is replete with testimony as to the character of the boys; no contrary evidence appears. One of James' teachers gave this description of the boy,

which is typical of the testimony regarding both of the minor sons:

Neat, clean and well-behaved and is a boy of outstanding character and a perfect gentleman no matter what the situation in class, in the hallway or in athletic events. * * * He is probably one of the best adjusted boys we have at Franklin. He has a large group of friends and a good class group of friends. * * * He has accepted a lot of outside responsibilities. * * * I have talked with Mrs. Conkling about it and have received excellent cooperation from her. * * * He's very physically mature and very mentally mature. * * * I have seen his brother at athletic events and both are quite athletically minded and enjoy sporting events and participating. * * * Jim has a very good sense of what is right and wrong, better than average judgment and is very honest.

A Newton friend of plaintiff and defendant testified regarding all three boys:

The Conkling children are three well behaved children who are always clean and well fed and looked healthy. I felt they were well adjusted and I think she's a fine mother.

A Cedar Rapids neighbor testified:

I am acquainted with the Conkling children and they have been in my home. My association with them has been very pleasant and I enjoy having them in my home. I think they are delightful children, well brought up and thoroughly enjoyable and well mannered. I believe they are happy and contented, well adjusted.

Plaintiff can take some credit for these outstanding youths, but the boys spent considerably more time with defendant than with him. We simply cannot blink defendant's good results with the children, whatever we may think of her conduct with respect to her husband. If she erred with the boys, the error was in being too strict.

Custody of the oldest boy, who is now of age and away from home, is not involved. We have the problem of custody of James and Jeffrey, now aged 16 and 13. James will be home only a couple more years before he goes to college; Jeffrey, five years.

At this point we must consider three legal propositions plaintiff raises. Plaintiff claims the trial court erroneously prevented him from impeaching defendant as a witness, defendant's dismissals of two prior divorce suits constitute an adjudication against her now, and the trial court erroneously upheld defendant's refusal to answer certain questions.

 (a) Plaintiff's first proposition is that the trial court erroneously sustained defendant's objections to his questions to his witnesses regarding defendant's reputation for truth and veracity. The suit is in equity but the trial court ruled on objections. This should not ordinarily be done, for if the objection is erroneously sustained we do not have the answer for use on the de novo appeal. Rather than requiring the interrogating party to make an offer of proof each time by having the witness answer subject to the objection, the trial court should usually simply refrain from ruling. Passing that point, however, no error appears in the rulings for the testimony was intended to discredit defendant as a witness whereas defendant had not yet testified. "The proper time for impeaching the credit of a witness is after he has been examined, and evidence is not admissible to impeach a person who has not yet been introduced, sworn, or examined as a witness." 98 C.J.S. Witnesses § 481 at 364.

(b) As to plaintiff's second legal proposition, our rule provides that a party's second dismissal of an action "shall operate as an adjudication against him on the merits * * *." Rule 215, Rules of Civil Procedure. We think defendant's dismissal of her second divorce suit on November 3, 1967, constitutes an adjudication against her on the merits to that date.

■ But that does not solve our problem of deciding the present case. In the first place, this suit was not tried until 1969, and defendant was at liberty to show intervening events as to all issues in the action. Matrimonial cases are different from many cases. In a dispute as to whether a note was forged, the events occur at a given time. But matrimonial litigation involves continuing occurrences. Second, even if no intervening period of time were involved and we took defendant's counterclaim completely out of the case, we still have the issues in plaintiff's own petition: is plaintiff entitled to a divorce, is he entitled to custody, and is he obligated to support? That defendant could not affirmatively obtain a divorce or custody or support on a pleading by her predicated on events antedating November 3, 1967, does not mean that plaintiff is entitled to have the prayer of his petition automatically granted. Here again divorce differs from other litigation. "A default on the part of the defendant, by failing to appear or to plead, admits no allegation of the petition material to the right of divorce or to any other relief incidental thereto. It is incumbent upon the party seeking the divorce and the incidents thereof to establish the right thereto by the requisite proof." Hopping v. Hopping, 233 Iowa 993, 997, 10 N.W.2d 87, 90. See Code, 1966, §§ 598.4, 598.7. We must thus decide the basic three issues in the case raised by the petition—divorce, custody, and financial matters. We have already held that plaintiff should prevail on the first issue, the divorce itself.

(c) Plaintiff's third legal proposition involves the effect of a party's testifying on direct examination upon his privilege against self-incrimination on cross-examination. See Annot., 72 A.L.R.2d 830.

This problem arose in connection with the issue of defendant's testimony about her own conduct. Defendant testified on her own behalf that her conduct in certain respects had been proper. On cross-examination she was questioned about the subject. She claimed privilege as to her conduct subsequent to the parties' final separation. Were the questions propounded proper cross-examination, apart from the question of privilege?

Iowa follows the rule that although the trial court has some discretion, "cross-examination must ordinarily be limited to the scope of the examination in chief * * *." McNeely v. Conlon, 216 Iowa 796, 798, 248 N.W. 17, 18. See Note, 24 Iowa L.Rev. 564. The cross-examination is not limited to "the precise, narrow scope of questions asked on direct examination, but extends to the broader scope of subject matters touched on in counsel's direct examination * * *." 98 C.J.S. Witnesses § 393b at 168; See Uhlenhopp v. Steege, 233 Iowa 368, 372, 7 N.W.2d 195, 197 ("matters about which he has been examined upon direct examination"). Obviously a party cannot testify as to the favorable part of a matter on direct and prevent the opponent from bringing out the unfavorable part on cross.

■ In her direct examination, defendant did not confine herself in point of time to the period prior to the last separation. Defendant having thus opened up both the pre- and post-separation periods, plaintiff's cross-examination as to those periods was within the scope of proper cross-examination. We do not have to decide whether plaintiff could cross-examine regarding the "subject" of defendant's conduct in the respects in question as to the period after the separation, if defendant had only testified as to her conduct before the separation.

■ What then about defendant's privilege against self-incrimination? Defendant waived her privilege as to matters within the scope of proper cross-examination. Brown v. United States, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589. The present situation goes beyond Amana Society v. Selzer, 250 Iowa 380, 94 N.W.2d 337, Allen v. Lindeman, 259 Iowa 1384, 148 N.W.2d 610, and Bauer v. Stern

Finance Co., 169 N.W.2d 850 (Iowa). In those cases the party was required procedurally to speak or suffer an adverse result and he did not speak. Here the party did speak but did not desire to subject herself to cross-examination on the matters she spoke about. As stated in the Brown decision (356 U.S. at 155–156, 78 S.Ct. at 627, 2 L.Ed.2d at 597):

The witness himself, certainly if he is a party, determines the area of disclosure and therefore of inquiry. Such a witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell. * * * Petitioner, as a party to the suit, was a voluntary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination.

■ The trial court erroneously upheld defendant's claim of privilege, but did correctly infer that the answers if given would have been adverse to defendant, under the principle of Allen v. Lindeman, 259 Iowa 1384, 148 N.W.2d 610. Plaintiff did not move to strike defendant's testimony on direct examination or her counterclaim. See Christenson v. Christenson, 281 Minn. 507, 162 N.W.2d 194; Franklin v. Franklin, 365 Mo. 442, 283 S.W.2d 483; Berner v. Schlesinger, 11 Misc.2d 1024, 178 N.Y. S.2d 135, affirmed, 6 App.Div.2d 781, 175 N.Y.S.2d 579; Annest v. Annest, 49 Wash. 2d 62, 298 P.2d 483; Annot., 4 A.L.R.3d 545.

We thus have a situation in which defendant's testimony in chief is before us, but we do not have her answers to the pertinent inquiries on cross-examination. Must the case be reversed to take that additional testimony? We think not, for two reasons. The first is that we, like the trial court, infer from defendant's refusal to answer the questions that her answers would be adverse to her. Allen v. Lindeman, 259 Iowa 1384, 148 N.W.2d 610. The second is that taking all of the circumstantial evidence, we are persuaded without express admissions by defendant that her conduct in the respects in question was wrongful. Express admissions would merely be cumulative.

Returning now to the second main issue in the case, custody, where does all this place us? Regarding custody, "The governing principle is the best interest of the children." Forsyth v. Forsyth, 172 N.W. 2d 111, 114 (Iowa). As stated in Blundi v. Blundi, 243 Iowa 1219, 1225, 55 N.W.2d 239, 242, "We have frequently said and the modern authorities agree that in a matter of this kind the welfare of the child is superior to the claim of either parent and the wishes of the parent are entitled to little if any consideration. Nor should the decree be modified to reward or punish either parent."

■ The conflict here is that the mother has spent most of the time rearing the children but is primarily the party in the wrong as between the spouses. The rule is, however, that guilt of a spouse does not foreclose the grant of custody to him or her but is a factor to be considered in connection with the welfare of the children— "transgressions of the mother must be considered together with other relevant factors including the habits and propensities of the parties desiring custody of children in determining what is best for the child." Utter v. Utter, 261 Iowa 683, 687–688, 155 N.W. 2d 419, 422. See Annot., 23 A.L.R.3d 6.

■ These boys have been with their mother most of their lives. They are with

her now. She is of course strongly attached to them. Actual results are more convincing than words, and her results with these boys—with plaintiff's help, of course—have been excellent. Plaintiff is still as busy with his surgery as ever. Despite our disapproval of defendant's conduct as regards plaintiff, we think the trial court properly decreed the boys should stay with her. From a legal standpoint, we think the case is similar to Annest v. Annest, 49 Wash.2d 62, 298 P.2d 483. There the defendant wife was subject to having her pleadings and direct testimony stricken for refusal to answer questions on cross-examination. But custody of the children was granted to her because the plaintiff husband did not prove that the best interest of the children indicated he should have them.

 One procedural aspect on this branch of the case has caused us concern. The parties agreed the trial judge should interview the two boys in chambers alone, and this was done. The trial judge knows what the boys said but we do not, and we are required to hear and decide the case anew. Interviews in chambers on stipulation are not uncommon, but we think that customarily the reporter should make a record of them. We are inclined to think, too, that ordinarily counsel ought to be present. Otherwise the judge may have important information about the case of which counsel are unaware at the trial. If the interview is conducted tactfully by the judge and counsel remain in the background, usually the children will not be inhibited in casting light on the situation —and that is the objective of the parties' stipulation. We will say in the present case that we have drawn no inference from the fact of the interview and the trial court's subsequent award of custody to the mother.

III. *Child Support, Alimony, and Costs.* Our statute provides in broad terms that the court may make such order regarding property and support "as shall be right." Code, 1966, § 598.14.

Regarding alimony and child support, the court said in Pfab v. Pfab, 257 Iowa 303, 305, 132 N.W.2d 483, 484:

Among the matters to be considered are the parties' age, health, present capacity to earn, amount of resources owned by each or both parties, contributions by each to the joint accumulations, the children involved, the duration of the marriage, indebtedness of each or both, conduct of the guilty party, and other facts which assist the court in reaching a just and equitable decision.

Practically everything the parties have came from plaintiff's practice of surgery, but they have surprisingly little. Plaintiff's income has been good, but they have spent it, having had much extra expense with all their trouble including the divorce suits. They have two cars, household goods, and their personal effects. Plaintiff has a small number of investments. He recently bought a home on credit but had to borrow the down payment. The principal asset of this family is plaintiff's ability to earn money in the coming years.

Defendant has no vocation in the business world. She is in middle life. She has had cancer on her face and severe facial injuries from the car accident. Her prospects for earning any significant amounts are dim.

Plaintiff's past earnings indicate he ought to be able to earn $40,000 to $50,000 annually in the years ahead, before taxes. He is approaching 50 years of age, however, and younger surgeons will be coming on. Thus his years of high earnings are not unlimited.

The parties face the same problem other couples have who go from the expense of one household to two. To make their funds suffice, after income taxes are paid, they will have to live on a more modest scale.

The trial court let each party retain the property he and she possessed at the time of decree and required plaintiff to pay the

existing bills, which are considerable. We see no objection to that portion of the decree; but "existing bills" are not to be considered to include defendant's expenses incident to prior divorce suits—a matter we will consider in due course. As to child support, the trial court awarded defendant $300 per month each for the two boys until self-supporting and required plaintiff to give them a college education. Defendant was awarded $500 per month alimony.

We have no doubt that defendant should receive child support and alimony as long as a son is in high school. We think however the child support provisions should be reduced and be more specific. As long as James and Jeffrey are in high school, plaintiff should pay $450 per month child support. Thereafter, and as long as only Jeffrey is in high school, plaintiff should pay $300 per month child support. Following graduation of each of those sons from high school, plaintiff should provide them at least a four-year college education if they so desire, so long as they respectively and successfully pursue their studies continuously each academic year—absence caused by the draft or illness excepted. The obligation respecting college should be discharged between plaintiff and the boys, rather than through defendant. Further, for months that the boys live in defendant's home during such college years—whether in the summer or during the school year—plaintiff should pay regular child support ($450 per month if both boys are living with defendant or $300 if one boy is living with her).

In addition, plaintiff should pay $500 per month alimony as long as either son is in high school (unless defendant sooner remarries or either party dies). Defendant will need this to provide a home and maintenance. We are troubled, however, as to whether plaintiff should be required to provide support to defendant after both boys leave home, in view of defendant's wrongful conduct as respects plaintiff.

Some statutes prohibit alimony to a guilty spouse, but the Iowa statute contains no such limitation. Mitchell v. Mitchell, 193 Iowa 153, 185 N.W. 62. Our earlier decisions indicate that alimony should be granted a wife who is guilty of serious wrong only when she was "the meritorious cause" of the husband's wealth and the husband was "not without fault". Fivecoat v. Fivecoat, 32 Iowa 198, 199; see also Coulthard v. Coulthard, 91 Iowa 742, 60 N.W. 213. The principle of later decisions, however, appears to be that the question of alimony to a guilty wife turns on all the equities in the case, with consideration being given to her guilt. Blain v. Blain, 200 Iowa 910, 205 N.W. 785; Keller v. Keller, 239 Iowa 687, 31 N.W.2d 343; Dunham v. Dunham, 244 Iowa 214, 56 N.W.2d 606; Simpson v. Simpson, 247 Iowa 546, 74 N.W.2d 582; Andreesen v. Andreesen, 252 Iowa 1152, 110 N.W.2d 275.

The parties have been married about 20 years. They have produced three sons. Plaintiff has his health and is capable of earning substantial sums. Defendant has no vocation. She has suffered two major physical problems. When Jeffrey completes high school, she will be 50 years old.

Despite defendant's wrongful conduct, we are unwilling to permit plaintiff, a successful surgeon, to cast her aside at 50 years of age with no income, no employment, no vocational training, and no prospect of a job. We think his obligation to pay $500 a month alimony should exist as long as plaintiff and defendant both live and defendant remains unmarried.

The matter of costs remains. In recent years, the parties have been involved in three divorce suits. Plaintiff had substantial legal expense in the first one. In the second one he had his own legal expense and paid $981.25 toward defendant's legal expense. Defendant's attorney asks $2,258.75 in addition for legal services in

that suit. In the present third suit, plaintiff has paid $750 toward defendant's legal expense and defendant's attorney asks $3,865 in addition, plus $4,294.17 for this appeal. Defendant's attorney has also advanced cash of $292.95.

Plaintiff's own legal expense in this third suit will be substantial. That expense, however, is not a matter to be covered by the decree. That is a matter between plaintiff and his own attorney. Plaintiff is not, of course, trying to cast any of his own legal expense on defendant.

■ The problem thus relates to defendant's legal expense. In the first instance that is defendant's expense and a matter between her and her attorney. But since she does not have assets, at least at present, she is entitled to have a reasonable amount allowed her from plaintiff for legal services in connection with the present suit, even though she is not successful as to the divorce. Lovett v. Lovett, 164 N.W.2d 793 (Iowa). If in fact she owes her attorney more than the reasonable amount which plaintiff can be required to pay, payment of the excess will be her own responsibility.

The issue of the amount to be placed on plaintiff for defendant's legal expense involves two questions—what about defendant's unpaid legal expense in the prior suit, and what is a reasonable sum to be placed on plaintiff for the present suit?

■ Ordinarily, of course, a litigant is not required to pay his opponent's attorney fees, but under our divorce statute the court may order a litigant to pay the adverse party a sum "to enable such party to prosecute or defend the action." Code, 1966, § 598.11. The rule is, however, that such liability relates to prosecution and defense of the present action, not some previous action which was dismissed. 27A C.J.S. Divorce § 216 at 938–939.

■ The other question relates to the reasonable amount which plaintiff should be required to pay toward defendant's legal expense in the present suit in the trial court and here. Involved are the pretrial legal services, the trial lasting four and a half

days, and this appeal. After consideration of the evidence, including plaintiff's substantial earning capacity, we find that plaintiff should pay $6,000 in addition to the sum of $750 he previously paid. Additional sums in fact owing, if any, will be defendant's own responsibility.

In sum, we uphold the trial court's decree except as modified in respect to child support and education, alimony, and defendant's attorney fees. The case will be remanded for decree in accordance with this opinion.

Costs in both courts to plaintiff.

Modified, affirmed, and remanded.

All Justices concur except STUART and REES, JJ., who take no part.

On Petition for Rehearing

UHLENHOPP, Justice.

The decree as modified by the opinion of this court takes effect as of August 14, 1969. Plaintiff is entitled to credit on the decree as modified for any sums he has paid since August 14, 1969, by way of temporary alimony and child support.

With such clarification, the petition for rehearing is denied.

Petition for rehearing denied.

All Justices concur except STUART, REES and REYNOLDSON, JJ., who take no part.